James C. HEANEY, Plaintiff-Appellant,

v.

The GOVERNMENT OF SPAIN and Adolpho Gomero, Defendants-Appellees.

No. 826, Docket 35654.

United States Court of Appeals, Second Circuit.

Argued June 8, 1971.

Decided July 2, 1971.

James C. Heaney, Buffalo, N. Y., appellant pro se (Daniel J. Maurin, Buffalo, N. Y., of counsel).

Charles S. Desmond, Buffalo, N. Y. (Robert D. Hayton and Clifton H. Stannage, New York City, of counsel), for appellees.

Before FRIENDLY, Chief Judge, and HAYS and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

James C. Heaney, a lawyer, brought this action in the District Court for the Western District of New York against the Government of Spain and its consular representative Adolpho Gomero. The complaint alleged that in 1968, having learned that Mr. Heaney had initiated civil rights litigation on behalf of residents of Northern Ireland against

the British Government before the Human Rights Commission of the Council of Europe, the defendants contacted him through their agents while Heaney was visiting Northern Ireland. After Heaney returned to New York, he was allegedly advised by the defendants that the British Government had violated Spain's sovereign rights in Gibraltar and that the defendants "wished to assist him in his various efforts to publicize, on a world wide basis, in the United Nations, in the Council of Europe, in the American Congress and in other governmental agencies, the British suppression of civil rights in Northern Ireland and the lack of free elections in that area" since this "would be of benefit to the defendants and would help them to bring about the expulsion of the British government in Gibraltar."

The complaint goes on to allege that after numerous conferences an agreement was reached, presumably, although the complaint does not specifically say so, with the above-noted purposes in mind, that plaintiff performed his obligations under the agreement, but that the defendants have refused to pay plaintiff $50,000 as provided therein, and that as a result plaintiff suffered $100,000 in damages. A second cause of action, which was based on the same underlying facts as the first, sought an additional $100,000 on the basis of the defendants' alleged tortious conduct in inducing plaintiff to enter into an agreement under which the defendants at no time intended fully to perform their obligations.

The complaint also charged that the actions of the Spanish Government described above were "outside the scope and authority of diplomatic activities in the United States" and that the actions of Gomero were "outside the scope of any lawful diplomatic functions and were beyond the scope and authority of any ministerial or consular office which he held with the Spanish government," even though Gomero was alleged to be an "employee and agent" of the Spanish Government at all relevant times.

The defendants moved for dismissal of the complaint on the grounds, insofar as here relevant, that the court lacked jurisdiction by virtue of the sovereign immunity of the Spanish Government and the consular immunity of Gomero.[1] In a brief order, the district court granted defendants' motion. With respect to the Spanish Government, the order was predicated on sovereign immunity; with respect to Gomero, it rested on alternative grounds—sovereign immunity (inasmuch as Gomero was acting as Spain's representative) and consular immunity (inasmuch as Gomero was a consular official). From this order Heaney has appealed.

Appellant launches two principal attacks on the district court's ruling that the defendants enjoyed immunity from suit. First, he contends that the making of a contract, whatever its purpose, is a commercial transaction, and commercial activities fall outside the zone of limited protection which the doctrine of sovereign immunity affords a foreign government and its representatives.

---

[1]. An affidavit in support of this motion submitted to the district court by His Excellency Jaime de Arguelles y Armada, the Spanish Ambassador to the United States, stated:

My Government has advised me that under international law and usage it cannot, with due regard to its national dignity, submit itself to the jurisdiction of the courts of a friendly, sovereign state. Therefore, I have been instructed, as Ambassador of my country, to make known to the Court that Spain most respectfully declines to waive its sovereign immunity or to consent to the jurisdiction of the Court.

The affidavit also stated, after noting that Gomero "has been and still is Consul General of Spain at New York":

My Government has directed me to state that any conferences between Plaintiff and [Gomero] were held in his capacity as Consul General of Spain and on behalf of my Government as its representative. Therefore, I have been instructed by my Government to make known to the Court that Spain most respectfully declines to waive the immunity of its said representative * * * or to consent to the jurisdiction of the Court over him.

Second, he asserts that the actions of the defendants, designed to "cause trouble for another government friendly to the United States, namely Great Britain * * * ignored well established diplomatic limits," and hence were outside the scope of whatever immunity the Spanish Government might enjoy in the pursuit of its appropriate objectives in the United States.

In light of Victory Transport, Inc. v. Comisaria General, 336 F.2d 354 (2 Cir. 1964), cert. denied, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), appellant's attacks are misguided. We there considered, in detail unnecessary to recount here, doctrinal developments regarding a foreign sovereign's immunity and the efforts—notable for their lack of success—to delineate the precise contours of the doctrine. 336 F.2d at 357–360. For present purposes, a summary of the general principles emerging from *Victory Transport* will suffice; the contemporary rationale for sovereign immunity is the avoidance of possible embarrassment to those responsible for the conduct of the nation's foreign relations; in determining the scope of the immunity which a foreign sovereign enjoys, courts have therefore deferred to the policy pronouncements of the State Department, see, e. g., National City Bank of New York v. Republic of China, 348 U.S. 356, 360–361, 75 S.Ct. 423, 99 L.Ed. 389 (1955); the State Department has explicitly indicated that its policy is generally predicated on a "restrictive" theory of sovereign immunity —"recognizing immunity for a foreign state's public or sovereign acts (*jure imperii*) but denying immunity to a foreign state's private or commercial acts (*jure gestionis*)." 336 F.2d at 358. See 26 Dept. State Bull. 984 (1952); "[t]he purpose of the restrictive theory of sovereign immunity is to try to accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts, with the interest of foreign governments in being free to perform certain political acts without undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts," 336 F.2d at 360; and the State Department's failure or refusal to suggest immunity is a significant factor to be taken into consideration in determining if the case is one justifying derogation from the normal exercise of the court's jurisdiction.[2] This court thus concluded:

> [W]e are disposed to deny a claim of sovereign immunity that has not been "recognized and allowed" by the State Department unless it is plain that the activity in question falls within one of the categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive. Such acts are generally limited to the following categories:
>
> (1) internal administrative acts, such as expulsion of an alien.
>
> (2) legislative acts, such as nationalization.
>
> (3) acts concerning the armed forces.
>
> (4) acts concerning diplomatic activity.
>
> (5) public loans.

336 F.2d at 360.

The act here in question—a contract by one government with an individual who agrees to generate adverse publicity against another in the contracting nation's hope that this will aid its initiatives to oust the second government from an area in which the contracting nation has a putative national interest —rather clearly falls within the fourth category of "strictly political or public acts" noted in *Victory Transport* ("acts concerning diplomatic activity").[3] The

---

2. In a letter dated May 24, 1971, we invited the State Department to submit its views on the questions presented by this case. The Department has not even acknowledged our letter.

3. The use of the term "diplomatic" in *Victory Transport* was obviously intended in the broad sense of the word and was not meant to be limited to the activities of diplomatic missions.

view that all contracts, regardless of their purpose, should be deemed "private" or "commercial" acts would lead to the conclusion that a contract by a foreign government for the purchase of bullets for its army or for the erection of fortifications do not constitute sovereign acts—a result we viewed as "rather astonishing" in *Victory Transport*, 336 F.2d at 359. Hence, unless and until we are instructed otherwise, see 336 F.2d at 360, our inquiry will continue to be governed by the criteria noted above, and under these criteria appellant's contention that his contract constitutes a "commercial transaction" must be rejected.

■ We are likewise unable to accept appellant's alternative contention that even if the acts in question may be characterized as political, they are political acts of a sort which are incompatible with the appropriate exercise of diplomatic functions by a foreign sovereign in this country and therefore unprotected by whatever immunity Spain might otherwise enjoy. Since appellant has referred us to no law, treaty, State Department directive, or other expression of official views proscribing actions such as those allegedly undertaken by the Spanish Government, and we have found none, there would appear to be no basis for appellant's major premise. But even assuming there were some basis for it, we are not persuaded that the suggested conclusion would follow. At least insofar as the political acts which appellant seeks to subject to the court's scrutiny are those of the sovereign itself, it would be curious indeed if the application of a doctrine designed to avoid embarrassment for those responsible for the conduct of our foreign relations were made to depend on a judicial determination of the propriety of such acts in light of the court's understand-ing of our diplomatic objectives. Rather, to condition a foreign sovereign's immunity on the outcome of a preliminary judicial evaluation of the propriety of its political conduct, with the attendant risks of embarrassment at the highest diplomatic levels, would frustrate the very purpose of the doctrine itself. In light of these considerations, it is not surprising to find that, absent waiver,[4] the only recognized exceptions to the "restrictive" theory of sovereign immunity appear to involve suits concerning (1) "commercial activity," see text *supra*, and (2) certain actions to obtain possession or to establish an interest in movable or intangible property, or immovable property located in the forum state. ALI, Restatement of Foreign Relations Law of the United States §§ 65, 68, 69 and comments thereto (1965). Appellant has referred us to no authority and proffered no persuasive reasons that would provide the basis for still a further exception.

■ In light of Heaney's allegation that defendant Gomero was at all relevant times "an employee and agent of the defendant Spanish Government," and the fact that the immunity of a foreign state extends to any other "official or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state," ALI, Restatement of Foreign Relations Law of the United States § 66(f) (1965), the above discussion might well be sufficient to dispose of Heaney's claim against Gomero individually. Nevertheless, inasmuch as the complaint, when read in light of the Spanish Ambassador's affidavit, see fn. 1 *supra*, might be generously construed as alleging that Gomero's actions were undertaken in his capacity as a consular representative of Spain, and this might impose more re-

---

4. Included in the concept of waiver is liability of a state initiating proceedings to a counterclaim of the opposing party. See National City Bank of New York v. Republic of China, *supra*, 348 U.S. 356, 364, 75 S.Ct. 423, 99 L.Ed. 389; ALI, Restatement of Foreign Relations Law of the United States § 70 (1965).

strictive limitations on his immunity from suit than if he were deemed to be acting as a general agent for his government, we will also consider, perhaps unnecessarily, whether Gomero's actions could be considered as exceeding his consular functions.

Appellant's arguments on this score will not withstand analysis. The Vienna Convention on Consular Relations, which was ratified by the United States on November 24, 1969, nearly ten months before this suit was commenced, provides, Art. 43:

> 1. Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions.
>
> 2. The provisions of paragraph 1 of this Article shall not, however, apply in respect of a civil action either:
>
> > (a) arising out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending State; or
> >
> > (b) by a third party for damage arising from an accident in the receiving State caused by a vehicle, vessel or aircraft.

Heaney's allegation that Gomero was an "employee or agent" of the Spanish Government at all relevant times precludes any contention that Gomero falls into the first exception and the second is clearly inapplicable. Appellant nevertheless urges that the conduct in question cannot be considered an act "performed in the exercise of consular functions," since Gomero's "anti-British activities while in the United States clearly fall outside the scope of normal consular duties." However, Article 5(m) of the Vienna Convention on Consular Relations, which follows twelve paragraphs broadly defining "consular functions," provides:

> [Consular functions consist in:] performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State.

Other than Heaney's conclusory assertion that Gomero's activities "were incompatible with the exercise of consular functions," he points to nothing which would suggest that these alleged activities would not be embraced by the catch-all definition quoted above, and such a narrow reading of the treaty would be inconsistent with its apparent purpose to eliminate the last vestiges of the notion that a consul was simply a "commercial representative." See Official Documents, United Nations, Report of the International Law Commission (covering the work of its thirteenth session, May 1–July 7, 1961), reproduced in 56 Am.J.Int'l L. 289–90, 330 (1962). Furthermore, since the State Department has ample means for dealing with consular officials whose activities it finds unacceptable, see, e. g., Vienna Convention on Consular Relations Art. 23 ("Persons declared 'non grata' "), it would hardly be appropriate, in the face of such a broadly worded provision as Art. 5(m), for the court to second-guess the State Department in this regard for purposes of determining whether consular immunity exists.

Finally, appellant asserts that however matters might have stood otherwise, the Vienna Convention on Consular Relations is inapplicable since it was not ratified until November 24, 1969, 115 Cong.Rec. 30997, after the alleged acts in question occurred. Although the complaint fails to allege exactly when the contract was made or breached, we shall assume that the operative facts on which the complaint is based occurred prior to November 24, 1969. However, even if we were to assume *arguendo* that the Convention is not applicable as controlling law to causes of action that

had accrued prior to its ratification, the signature of the United States to the Convention on April 24, 1963, has at least the effect of an expression of State Department policy, and the Supreme Court has instructed that "[i]t is * * * not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." Republic of Mexico v. Hoffman, 324 U.S. 30, 35, 65 S.Ct. 523, 530, 89 L.Ed. 729 (1945).

We have considered appellant's other contentions,[5] but find them without merit.

Affirmed.

5. The affidavit submitted to the district court by the Spanish Ambassador, see fn. 1 *supra*, with appropriate identifying documents, was more than sufficient to raise the issue of immunity by motion. Ex parte Muir, 254 U.S. 522, 532–533, 41 S.Ct. 185, 65 L.Ed. 383 (1921). While Heaney relies on the vagueness of his complaint in conjunction with the statement that a foreign government, in presenting a defense of immunity, must "prove most of the facts that underlie its claim," ALI Restatement of Foreign Relations Law of the United States § 72 at 225 (comment) (1965), he ignores the next sentence of the Restatement's comment which reads "Some of these facts, such as the existence of a foreign entity as a state and the status of its representative have already been conclusively determined by the acts of recognition and accreditation by the executive branch of the government of the United States." *Id.* Heaney alleges no facts, as distinguished from legal conclusions, see e. g., Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, 253–254, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960) ; Gold v. Macy, 234 F.Supp. 764 (E.D.N.Y.1964), which in light of the undisputed status of the defendants and the principles discussed above, would defeat a claim of immunity.