Isabel Morel De LETELIER et al., Plaintiffs,

v.

The REPUBLIC OF CHILE et al., Defendants.

Civ. A. No. 78–1477.

United States District Court, District of Columbia.

March 11, 1980.

Michael E. Tigar, Lynne A. Bernabei, Washington, D. C., for plaintiffs.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Presently before the Court is the question of its subject matter jurisdiction to entertain this action against defendant Republic of Chile. Despite the previous entry of a default against that foreign state that plaintiffs argue precludes further judicial scrutiny of this issue, the Court nonetheless is persuaded that the jurisdictional question must now be given careful consideration, and, having examined the relevant congressional enactment, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 (1976), is convinced that such jurisdiction does indeed exist, entitling plaintiffs to proceed to seek a judgment against the Chilean Republic.

Filed in August 1978 by Isabel, Christian, Jose, Francisco, and Juan Pablo Letelier, and Michael Maggio, respectively the widow, sons, and personal representative of Orlando Letelier, as well as by Michael Moffitt and Murray and Hilda Karpen, respectively the widower-personal representative and parents of Ronni Karpen Moffitt, the complaint herein, as amended, seeks recompense for tortious injuries connected with the deaths of both former Chilean ambassador and foreign minister Orlando Letelier and Ronni Moffitt in the District of Columbia on September 21, 1976, when Letelier's car, in which they were riding to work with Michael Moffitt, was destroyed by an explosive device. Plaintiffs allege that the bomb was constructed, planted, and detonated by defendants Michael Vernon Townley, Alvin Ross Diaz, Virgilio Paz Romero, Jose Dionisio Suarez Esquivel, Guillermo Novo Sampol, and Ignacio Novo Sampol, acting in concert and purportedly at the direction and with the aid of defendants Republic of Chile, its intelligence organ the Centro Nacional de Intelligencia (CNI) (formerly Direccion de Intelligencia Nacional, a/k/a

DINA), and supposed CNI–DINA agents and officers Pedro Espinoza Bravo, Juan Manuel Contreras Sepulveda, and Armando Fernandez Larios.[1] In accord with their allegations and acting pursuant to the provisions of the District of Columbia Code governing survival of actions, D.C.Code § 12–101 (1973), and wrongful death, *id.* § 16–2701 (Supp. V 1978), plaintiffs have set forth the following five causes of action that they contend give rise to civil liability on the part of the defendants:

1) Conspiracy to deprive Orlando Letelier and Ronni Moffitt of their constitutional rights, including equal protection of the law, and freedom of speech, press, association, and petition, in violation of 42 U.S.C. § 1985 (1976). Amended Complaint ¶ 7.

2) Assault and battery causing the deaths of Orlando Letelier and Ronni Moffitt. *Id.* ¶ 9.

3) Negligent transportation and detonation of explosives. *Id.* ¶ 11.

4) Assassination of Orlando Letelier and Ronni Moffitt in violation of international law. *Id.* ¶ 13.

5) Assault upon Orlando Letelier, an internationally protected person pursuant to 18 U.S.C. § 112 (1976), that was the proximate result of his death and the death of Ronni Moffitt. *Id.* ¶ 15.

Following service upon defendants Michael Vernon Townley, Alvin Ross Diaz, Ignacio Novo Sampol, and Guillermo Novo Sampol, and the failure of these defendants to answer, defaults were entered against them in late August 1978. Plaintiffs have been unable to obtain service upon Virgilio Paz Romero and Jose Dionisio Suarez Esquivel. Service was attempted upon Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, and Armando Fernandez Larios by registered mail to Chile and the return receipts were filed with the Court in September 1978. Subsequently, in August 1979 service was again attempted upon these three individuals in Chile pursuant to Federal Rule of Civil Procedure 4(i) by means of letters of request, signed by the Court, but proof of the completion of such service has not yet been forthcoming.

As to the Republic of Chile and CNI, pursuant to the terms of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1608(a)(4), two copies of the summons and amended complaint were dispatched by the Clerk of the Court to the United States Department of State on October 24, 1978. One of these copies, along with an explanatory diplomatic note, was delivered by the State Department to the Ministry of Foreign Affairs of the Republic of Chile in Santiago on November 17, 1978. On February 9, 1979, the Clerk of the Court was notified by letter from the Department of State that the Chilean Foreign Affairs Ministry, by a diplomatic note dated January

---

1. Just one week prior to the institution of this civil proceeding, a criminal action involving the deaths of former Chilean ambassador Letelier and Mrs. Moffitt was commenced in the United States District Court for the District of Columbia with the entry of an indictment naming all the individual defendants in this suit, except Michael Vernon Townley. *United States v. Sepulveda*, Crim.No. 78–0367 (D.D.C. filed Aug. 1, 1978). Of the eight individuals indicted, only Alvin Ross Diaz, Ignacio Novo Sampol, and Guillermo Novo Sampol, all members of the Cuban National Movement (CNM), were brought to trial. After a lengthy proceeding on charges including conspiracy to murder a foreign official, murder of a foreign official, and first degree murder, all three were convicted and given substantial sentences. Each of them has noted an appeal. *United States v. Sampol*, No. 79–1541 (D.C.Cir. filed Apr. 2, 1979); *United States v. Diaz*, No. 79 1542 (D.C.Cir. filed Apr. 2, 1979); *United States v. Sampol*, No. 79–1808 (D.C.Cir. filed Mar. 23, 1979).

With regard to the remaining defendants, CNM members Virgilio Paz Romero and Jose Dionisio Suarez Esquivel are fugitives sought by the Federal Bureau of Investigation, while the efforts of the United States to extradite Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, and Armando Fernandez Larios have, up to this point, been without success. As to Michael Vernon Townley, an American citizen and self-confessed CNI–DINA agent who testified at the criminal trial as a government witness concerning his substantial involvement in the killings, he entered a plea of guilty on August 11, 1978, to a charge of conspiracy to kill a foreign official and is now serving his sentence under the custody of the United States Department of Justice Witness Protection Program.

16, 1979, had requested that the copy of the summons and amended complaint be returned to the Court. In the note, the Ministry of Foreign Affairs made it clear that CNI was not a separate legal entity but only an organ of the Chilean government and that the Republic of Chile would not acquiesce in the jurisdiction of this Court over the subject matter of this suit.

On May 2, 1979, following the plaintiffs' filing that same day of a motion, with supporting memorandum of law, seeking the entry of a default against the Republic of Chile, the Honorable John H. Pratt held a hearing on that request. The next day an order was filed entering a default against the Republic of Chile.

On June 27, 1979, this action, along with other cases, was randomly reassigned to this judge as a new member of the Court. A hearing memorandum on plaintiffs' right to relief against all defendants was filed on August 17, 1979, but on September 4, 1979, prior to the scheduling of a hearing at which the plaintiffs would be allowed to make their required evidentiary showing in order to obtain the entry of a default judgment, 28 U.S.C. § 1608(e) (1976),[2] the Department of State sent to the Clerk of the Court, at the request of the Republic of Chile, a copy of Embassy Note No. 180, dated August 14, 1979, and an accompanying memorandum of law in which the Chilean Republic reiterated its belief that the Court lacks subject matter jurisdiction.

On September 13, 1979, plaintiffs moved, pursuant to Federal Rule of Civil Procedure 11, to strike the note because it was a pleading not signed by counsel. By order filed October 11, 1979, the Court denied plaintiffs' motion in that the note and the accompanying memorandum were not a "pleading" but instead could be considered a "suggestion" under Rule 12(h)(3) that the Court lacks subject matter jurisdiction. Further, the Court asked plaintiffs to submit a memorandum of law concerning that question as well as the effect of Judge Pratt's entry of a default upon this Court's ability to consider that issue. Such a memorandum has been filed.

Although it is firmly established that subject matter jurisdiction cannot be conferred upon a court by consent of the parties involved, whether that consent is by affirmation or acquiescence of the defendant, and that the issue of subject matter jurisdiction can be raised by the court sua sponte at any time, 1 *Moore's Federal Practice* ¶ 0.60[4], at 624–28 (2d ed. 1979); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3522, at 46–48 (1975), plaintiffs nevertheless argue that the entry of a default by Judge Pratt after their submission of a memorandum dealing with subject matter jurisdiction and a hearing at which the issue could have been raised should preclude the Court from further considering the issue. According to plaintiffs, two different considerations require this result. Citing *DiFrischia v. New York Central Railroad*, 279 F.2d 141 (3d Cir. 1960), they first contend that the Court should not allow the government of Chile to "play fast and loose" with the judicial machinery by allowing it to resurrect a question that already has been decided. In addition, they assert that the doctrine of "law of the case" precludes this judge from further consideration of the matter.

In *DiFrischia*, the United States Court of Appeals for the Third Circuit, expressing its unwillingness to allow a party to "play fast and loose with the judicial machinery and deceive the Courts," refused to allow a defendant who had stipulated to the existence of diversity jurisdiction to move two years later to dismiss for want of such jurisdiction. 279 F.2d at 144. Although the Court must concede that the actions of the Chilean government in re-

---

**2.** For a plaintiff to be able to secure a default judgment under the Foreign Sovereign Immunities Act, he must establish his claim or right to relief by evidence satisfactory to the court, 28 U.S.C. § 1608(e) (1976), the same requirement applicable to default judgments against the United States under Federal Rule of Civil Procedure 55(e), H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 25–26 (1976), *reprinted in* [1976] *U.S. Code Cong. & Admin.News, p. 6604; S.Rep.No. 94–1310, 94th Cong., 2d Sess. 25 (1976).*

fusing to enter a formal appearance through counsel despite the existence of statutory provisions allowing a special appearance, 28 U.S.C. § 1330(e) (1976), or to communicate with the Court other than by diplomatic notes relayed through the State Department, is not in conformance with what would be considered the preferred procedure for raising the jurisdictional question it seeks to have decided, it is clear that the decision of the Third Circuit in *DiFrischia*, the rationale of which has not been widely followed, *see Eisler v. Stritzler*, 535 F.2d 148, 151–52 & n. 2 (1st Cir. 1976), is without applicability here since the government of Chile, despite its unorthodox presentation of its views, has maintained consistently that this Court lacks subject matter jurisdiction.

As to the application of the doctrine of "law of the case" in this instance, no less a jurist than Mr. Justice Holmes has stated the rule as being that "[i]n the absence of statute the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912), *quoted in Van Voorhis v. District of Columbia*, 240 F.Supp. 822, 824 (D.D.C. 1965); *accord, Naples v. United States*, 123 U.S.App.D.C. 292, 293 n. 1, 359 F.2d 276, 277 n. 1 (1966) (per curiam); *United States v. Fuller*, 277 F.Supp. 97, 99 (D.D.C.1967). While the benefits of adherence to the doctrine of law of the case are obvious, both in terms of judicial economy and as a means of avoiding unnecessary uncertainty for the parties involved, nonetheless the Court

finds the existence of special factors here which make it necessary that the issue of subject matter jurisdiction be thoroughly considered by this Court. Although Judge Pratt's entry of a default could be considered an implicit recognition that the courts of the United States do have subject matter jurisdiction over the Republic of Chile in this action, the nature of this litigation, it apparently being the first instance in which redress for tortious injuries such as are alleged here has been sought under the Foreign Sovereign Immunities Act, as well as the potential diplomatic impact of any action by the Court, makes it necessary that the question of jurisdiction be fully and sensitively explored on the record.

Turning then to that task, it is necessary to focus upon the provisions of the Foreign Sovereign Immunities Act, which, like all other statutory enactments regulating the subject matter jurisdiction of the federal district courts, delimits the boundaries within which the jurisdictional power of this Court can be exercised.[3] *See, e. g., Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 372, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978); *Aldinger v. Howard*, 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). Because of the manner in which the Act is structured, several of its provisions, all found in title 28 of the United States Code, impact upon the question of the Court's jurisdiction. Among those are the following:

§ 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not

---

**3.** As constitutional authority for the enactment of the Foreign Sovereign Immunities Act, Congress relied on its power to prescribe the jurisdiction of the federal courts, U.S.Const. art. I, § 8, cl. 9; *id.* art. III, § 1, to define offenses against the "Law of Nations," *id.* art. I, § 8, cl. 10, to regulate commerce among foreign nations, *id.* § 8, cl. 3, and "to make all laws which shall be necessary and proper to carry into Execution . . . all . . . Powers vested . . . in the Government of the United

States," including the judicial power of the United States over controversies between "a State, or the Citizens thereof, and foreign States," *id.* § 8, cl. 18; *id.* art. III, § 2, cl. 1. H.R.Rep.No.94–1487, *supra* at 12; S.Rep.No. 94–1310, *supra* at 12. The Republic of Chile has not challenged either the authority of Congress to pass legislation governing grants of sovereign immunity or its authority to enact any of the specific provisions of the Foreign Sovereign Immunities Act.

entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

§ 1602. Findings and declaration of purpose

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

§ 1604. Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(5) not otherwise encompassed in paragraph (2) above [(which denies immunity for a foreign state's commercial activities)] in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. §§ 1330(a), 1602, 1604, 1605(a)(5) (1976). As a reading of these sections reveals, the Act very broadly confers original jurisdiction upon federal district courts to hear any nonjury civil action against a foreign state, thereby encompassing the action plaintiffs now seek to prosecute against the Republic of Chile. The matter does not end there, however, for this jurisdictional grant is qualified in that it has been made subject to any proper interposition of the defense of sovereign immunity, a defense upon which the defendant places its greatest reliance.[4]

---

4. In addressing the question of the procedure for raising the defense of sovereign immunity, both the House and Senate committee reports concerning the Foreign Sovereign Immunities Act of 1976 state that "sovereign immunity is an affirmative defense which must be specially pleaded." H.R.Rep.No.94–1487, *supra* at 17; S.Rep.No.94–1310, *supra* at 17. In this instance the Republic of Chile, while not having entered a formal appearance through counsel or having filed a responsive pleading through an accredited representative, has had the Department of State transmit to the Court a diplomatic note from the Ministry of Foreign Affairs and a note from the Embassy of Chile in which the issues of the Court's jurisdiction and Chile's sovereign immunity have been discussed. The extent to which the affirmative defense of sovereign immunity can be raised by way of such a procedure rather than by a formal appearance or the filing of a pleading is one that the Court need not answer definitively, see generally, however, *Ex parte Muir*, 254 U.S. 522, 532–33 (1921); *Puente v. Spanish Nat. State*, 116 F.2d 43, 44 (2d Cir. 1940), *cert. denied*, 314 U.S. 627, 62 S.Ct. 57, 86 L.Ed. 504 (1941); 2A *Moore's Federal Practice* ¶ 8.28, at 8–270 to 275 (2d ed. 1979) (affirmative defense can be raised by motion to dismiss or motion for summary judgment); *Restatement (Second) of Foreign Rela-*

As a doctrine of international law requiring that, under the proper circumstances, a domestic court will relinquish jurisdiction over a foreign state, sovereign immunity first was recognized in American law in the early nineteenth century by Chief Justice Marshall in *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), in which a foreign entity's plea of immunity, as supported by the executive branch, was found to be valid as within the general law and practice of nations. By this century, however, the judicial reliance upon general principles of international law to decide questions involving sovereign immunity began to give way to a deference to the practices and policies of the Department of State, as articulate in the suggestions of immunity presented to the courts by the department. *See, e. g., Mexico v. Hoffman*, 324 U.S. 30, 35–36, 65 S.Ct. 530, 532–533, 89 L.Ed. 729 (1945); *Ex parte Peru*, 318 U.S. 578, 587–89, 63 S.Ct. 793, 799, 800, 87 L.Ed. 1014 (1943). As was most fully articulated in 1952 in a letter from Jack Tate, Legal Adviser to the State Department, to the Attorney General, the department's policy was to render a suggestion of immunity only in those restricted instances in which the acts of a friendly foreign state were of a public or sovereign nature (*jure imperii*) rather than being simply private or commercial (*jure gestionis*). 26 Dep't State Bull. 984 (1952).

The distinction between a state's public actions and its private or commercial activities was found to be one that often was easier to proclaim than to apply. The determination of the executive about what constituted a public, as opposed to a private or commercial act, frequently was subject to diplomatic rather than strictly legal considerations, thereby resulting in suggestions of immunity that were not in conformity with the policy articulated in the Tate letter. Moreover, even in those instances when executive suggestions were not involved, there was a lack of uniform judicial interpretation.[5]

It is against this background that the Congress considered and enacted the Foreign Sovereign Immunities Act of 1976.

As is made clear both in the Act and in its legislative history, one of its principal purposes was to reduce the foreign policy implications of sovereign immunity determinations and assure litigants that such crucial decisions are made on purely legal grounds, an aim that was to be accomplished by transferring responsibility for such a decision from the executive branch to the judiciary. 28 U.S.C. § 1602 (1976); H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 7 (1976), *reprinted in* [1976] *U.S.Code Cong. & Admin.News,* p. 6604; S.Rep.No.94–1310, 94th Cong., 2d Sess. 9 (1976). In addition, the Act itself is designed to codify the restrictive principle of sovereign immunity that makes a foreign state amenable to suit for the consequences of its commercial or private, as opposed to public acts. *Id.*

In considering the related questions of jurisdiction and sovereign immunity under the Act, one court has observed:

The Act's central feature is its specification of categories of actions for which foreign states are not entitled to claim

---

*tions Law of the United States* § 71, Comment b (1965), for even assuming it has been pleaded properly, the Court still has subject matter jurisdiction for the reasons discussed *infra.*

**5.** The judicial attempt at definition that is perhaps most widely recognized is that of the United States Court of Appeals for the Second Circuit in *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), in which the court classified public acts as those involving (1) internal administration, such as expulsion of an alien; (2) legislation,

such as nationalization; (3) the armed forces; (4) diplomatic activity; and (5) public loans.

For more detailed discussions of the principle of sovereign immunity as it existed prior to the Foreign Sovereign Immunities Act, see generally *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes, supra,* 336 F.2d at 357–60; H.R.Rep.No.94–1487, *supra* at 8–9; S.Rep.No.94–1310, *supra* at 9–10; Note, *Sovereign Immunity in the Supreme Court: Using the Certiorari Process to Avoid Decisionmaking,* 16 Va.J. Int'l L. 903, 904–09, 920–24 (1976). See also *Restatement (Second) of Foreign Relations Law of the United States. supra,* §§ 63–72.

the sovereign immunity from American court jurisdiction otherwise granted to such states. These exceptions are contained not in the sections of the Act which describe the grounds on which jurisdiction may be obtained, however, but are phrased as substantive acts for which foreign states may be found liable by American courts. This effects an identity between substance and procedure in the Act which means that a court faced with a claim of immunity from jurisdiction must engage ultimately in a close examination of the underlying cause of action in order to decide whether the plaintiff may obtain jurisdiction over the defendant.

*Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 851 (S.D.N.Y.1978). In the instant action, relying on section 1605(a)(5) as their basis for combatting any assertion of sovereign immunity, plaintiffs have set forth several tortious causes of action arising under international law, the common law, the Constitution, and legislative enactments, pp. 666–667 *supra,* all of which are alleged to spring from the deaths of Orlando Letelier and Ronni Moffitt. The Republic of Chile, while vigorously contending that it was in no way involved in the events that resulted in the two deaths, further asserts that, even if it were, the Court has no subject matter jurisdiction in that it is entitled to immunity under the Act, which does not cover political assassinations because of their public, governmental character.

■ As supportive of its conclusion that political, tortious acts of a government are to be excluded, the Republic of Chile makes reference to the reports of the House and the Senate Judiciary Committees with regard to the Act, in which it was stated:

Section 1605(a)(5) is directed primarily at the problem of traffic accidents but is cast in general terms as applying to all tort actions for money damages. . . .

\* \* \* \* \* \*

The purpose of section 1605(a)(5) is to permit the victim of a traffic accident or other noncommercial tort to maintain an action against a foreign state to the extent otherwise provided by law.

H.R.Rep.No.94–1487, *supra* at 20–21; S.Rep.No.94–1310, *supra* at 20–21. It is clear from these passages, the Chilean government asserts, that the intent of Congress was to include only private torts like automobile accidents within the exclusion from immunity embodied in section 1605(a)(5).

Prominently absent from defendant's analysis, however, is the initial step in any endeavor at statutory interpretation: a consideration of the words of the statute. *See, e. g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *American Trucking Associations v. United States,* 195 U.S.App.D.C. 266, 561–62, 602 F.2d 444, 449–50, *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Subject to the exclusion of these discretionary acts defined in subsection (A) and the specific causes of action enumerated in subsection (B), neither of which have been invoked by the Republic of Chile, by the plain language of section 1605(a)(5) a foreign state is not entitled to immunity from an action seeking money damages "for personal injury or death . . caused by the tortious act or omission of that foreign state" or its officials or employees. Nowhere is there an indication that the tortious acts to which the Act makes reference are to only be those formerly classified as "private," thereby engrafting onto the statute, as the Republic of Chile would have the Court do, the requirement that the character of a given tortious act be judicially analyzed to determine whether it was of the type heretofore denoted as *jure gestionis* or should be classified as *jure imperii.* Indeed, the other provisions of the Act mandate that the Court not do so, for it is made clear that the Act and the principles it sets forth in its specific provisions are henceforth to govern all claims of sovereign immunity by foreign states. 28 U.S.C. §§ 1602, 1604 (1976).

Although the unambiguous language of the Act makes inquiry almost unnecessary,

further examination reveals nothing in its legislative history that contradicts or qualifies its plain meaning. The relative frequency of automobile accidents and their potentially grave financial impact may have placed that problem foremost in the minds of Congress, but the applicability of the Act was not so limited, for the committees made it quite clear that the Act "is cast *in general terms* as applying to *all tort actions* for money damages" so as to provide recompense for "the victim of a traffic accident or *other noncommercial tort.*" H.R.Rep.No. 94–1487, *supra* at 20–21 (emphasis supplied); S.Rep.No.94–1310, *supra* at 20–21 (same). Further, any notion that the Congress wished the courts to go outside the scheme promulgated by legislative action to determine the extent to which the defense of sovereign immunity could be invoked is foreclosed by the committee reports that not only state that "[t]his bill . . . sets forth the *sole and exclusive* standard to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States," H.R.Rep.No.94–1487, *supra* at 12 (emphasis supplied); S.Rep.No.94–1310, *supra* at 11 (same), but also provide that the burden of proof shall be upon the foreign state to present evidence "that the plaintiff's claim relates to a *public act* of the foreign state—that is, *an act not within the exceptions in section 1605–1607,"* H.R.Rep. No.94–1487, *supra* at 17 (emphasis supplied); S.Rep.No.94–1310, *supra* at 17 (same). Thus, it is apparent that the terms of section 1605(a)(5) set the sole standard under which any claim of sovereign immunity must be examined.[6]

6. The Republic of Chile has cited several cases decided since the passage of the Foreign Sovereign Immunities Act that it contends establish foreign states under the Act are to be granted immunity for any tortious act committed by a sovereign entity while acting in its public capacity. The Court finds these cases inapposite.

In *Carey v. National Oil Corp.,* 453 F.Supp. 1097, 1102 (S.D.N.Y.1978), *aff'd on other grounds,* 592 F.2d 673 (2d Cir. 1979) (per curiam), while indicating in what could be classified as dictum that the alleged acts of a foreign state to induce a breach of contract were sovereign and therefore not within the exceptions to immunity in the Act, the court found that at best the supposed actions of the foreign state would state a claim for tortious interference with contract rights, which was exempted specifically by section 1605(a)(5)(B). Likewise in *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855 (S.D.N.Y.1978), the court found it had no jurisdiction to entertain a claim of libel as a noncommercial tort under section 1605(a)(5) because such a cause of action was exempted by the terms of subsection (B). Thus, in each of these instances, the tort action in question was barred not by classification of the actions in question as public or private, but rather because Congress had exempted them from the broad category of noncommercial torts for which a foreign state cannot claim immunity.

Reference is also made by the Chilean Republic to *Gittler v. German Information Center,* 95 Misc.2d 788, 408 N.Y.S.2d 600 (Sup.Ct. 1978). In that case, suit was brought to recover unpaid compensation and benefits allegedly due an American citizen for his work on documentary films commissioned by an entity of the West German government and designed to fos-

ter cultural relations between Germany and the United States. Relying on the decision of the United States Court of Appeals for the Second Circuit in *Heaney v. Government of Spain,* 445 F.2d 501 (2d Cir. 1971), in which the court determined that a government's contract for public relations work designed to discredit another nation was a public or sovereign act entitling it to immunity from any suit for breach of that contract, the New York Supreme Court in *Gittler* found the agreement in question to be one involving sovereign action of West Germany, thereby precluding any suit to enforce its terms. 408 N.Y.S.2d at 601. Although it is unclear whether the court in *Gittler* made its finding of immunity pursuant to the Foreign Sovereign Immunities Act, that Act having become effective after the date of the alleged breach of contract and after suit was filed, nonetheless to the extent that the case can be so read, this Court declines to follow its analysis of the immunity issue. It is made evident both in the Act and in its legislative history that any decision to grant immunity to a foreign state is dependent on the provisions of the Act and thus the case law on the subject of sovereign immunity as it analyzed the distinctions between commercial or private acts and a state's public actions is persuasive only to the extent those interpretations can be deemed to be in conformity with the exceptions to immunity as set forth in the Act. *Compare* H.R.Rep.No.94–1487, *supra* at 16 (contract of foreign government to buy provisions or equipment for armed forces or to construct government building is commercial activity under Act) *and* S.Rep.No.94–1310, *supra* at 15–16 (same) *with Heaney v. Government of Spain, supra,* 445 F.2d at 504 (dictum) (foreign

Examining then the specific terms of section 1605(a)(5), despite the Chilean failure to have addressed the issue, the Court is called upon to consider whether either of the exceptions to liability for tortious acts found in section 1605(a)(5) applies in this instance. It is readily apparent, however, that the claims herein did not arise "out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," 28 U.S.C. § 1605(a)(5)(B) (1976), and therefore only the exemption for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused," *id.* § 1605(a)(5)(A), can be applicable.

As its language and the legislative history make apparent, the discretionary act exemption of subsection (A) corresponds to the discretionary act exception found in the Federal Tort Claims Act. H.R.Rep.No.94–1487, *supra* at 21; S.Rep.No.94–1310, *supra* at 20. *Compare* 28 U.S.C. § 1605(a)(5)(A) (1976) *with id.* § 2680(a). As defined by the United States Supreme Court in interpreting the Federal Tort Claims Act, an act that is discretionary is one in which "there is room for policy judgment and decision." *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). Applying this definition to the instant action, the question becomes, would the alleged determination of the Chilean Republic to set into motion and assist in the precipitation of those events that culminated in the deaths of Orlando Letelier and Ronni Moffitt be of the kind in which there is "room for policy judgment and decision."

While it seems apparent that a decision calculated to result in injury or death to a particular individual or individuals, made for whatever reason, would be one most assuredly involving policy judgment and decision and thus exempt as a discretionary

act under section 1605(a)(5)(A), that exception is not applicable to bar this suit. As it has been recognized, there is no discretion to commit, or to have one's officers or agents commit, an illegal act. *Cruikshank v. United States,* 431 F.Supp. 1355, 1359 (D.Hawaii 1977); *see Hatahley v. United States,* 351 U.S. 173, 181, 76 S.Ct. 745, 751, 100 L.Ed. 1065 (1956). Whatever policy options may exist for a foreign country, it has no "discretion" to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law. Accordingly there would be no "discretion" within the meaning of section 1605(a)(5)(A) to order or to aid in an assassination and were it to be demonstrated that a foreign state has undertaken any such act in this country, that foreign state could not be accorded sovereign immunity under subsection (A) for any tort claims resulting from its conduct. As a consequence, the Republic of Chile cannot claim sovereign immunity under the Foreign Sovereign Immunities Act for its alleged involvement in the deaths of Orlando Letelier and Ronni Moffitt.

Finally, the Republic of Chile seeks to invoke the act of state doctrine to excuse itself from the jurisdiction of the Court. As recognized by the Supreme Court in its recent decision in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* the traditional formulation of this principle provides:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

government's contract to purchase bullets or erect fortifications for army is sovereign rather than commercial or private act) *and Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes, supra,* 336 F.2d at

360 (dictum) (purchase of shoes or bullets for army, erection of fortifications, or rental of house for embassy not private acts). See also *Broadbent v. Organization of American States,* No. 78 1465 (D.C.Cir. Jan. 8, 1980).

425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 1859, 48 L.Ed.2d 301 (1976) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)). While again denying involvement in the deaths at issue here, the Chilean Republic asserts that those acts of which it is accused would be public ventures carried out within Chile itself and therefore entitled to immunity under the act of state doctrine.

Although the acts allegedly undertaken directly by the Republic of Chile to obtain the death of Orlando Letelier may well have been carried out entirely within that country, that circumstance alone will not allow it to absolve itself under the act of state doctrine if the actions of its alleged agents resulted in tortious injury in this country. To hold otherwise would totally emasculate the purpose and effectiveness of the Foreign Sovereign Immunities Act by permitting a foreign state to reimpose the so recently supplanted framework of sovereign immunity as defined prior to the Act " 'through the back door, under the guise of the act of state doctrine.' " H.R.Rep.No. 94–1487, *supra* at 20 n. 1 (quoting Amicus Brief of United States at 41, *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)); S.Rep.No.94–1310, *supra* at 19 n. 1 (same).

Accordingly, the Court having subject matter jurisdiction to entertain this action, a status hearing will be held on March 18, 1980, at 10:00 a. m. at which time argument will be heard on plaintiffs' pending motion to compel defendant Townley to answer interrogatories and a time will be set for a hearing, pursuant to 28 U.S.C. § 1608(e), to establish evidence satisfactory to the Court to permit the entry of a default judgment against the Republic of Chile.