**Josephine ALICOG, et al., Plaintiffs,**

v.

**KINGDOM OF SAUDI ARABIA, et al., Defendants.**

**Civ. A. No. H–93–4169.**

United States District Court, S.D. Texas, Houston Division.

Aug. 10, 1994.

Robert Charles Shaddox, Houston, TX, for plaintiffs.

Maureen E. Mahoney, Washington, DC, for King Fahd & Kingdom of Saudi Arabia.

T. Scott Allen, Jr., Houston, TX, for Afifis.

OPINION ON DISMISSAL AND
SUMMARY JUDGMENTS

HUGHES, District Judge.

1. *Introduction.*

Two people have sued Majid Afifi, Salim Afifi, King Fahd, and the kingdom of Saudi Arabia for having been falsely imprisoned and abused while they were in Houston as servants for Prince Saad. Under international law King Fahd, as the head of state, is immune from the judicial power of the United States. Under the Foreign Sovereign Immunities Act, the kingdom is immune from liability for consular officers' acts that are plausibly related to a consulate's legitimate diplomatic purposes. Under Texas law, the Afifi brothers are not liable because they did not knowingly participate in a wrong separate from the acts of the Saudi Consul.

2. *Facts.*

While the court accepts the plaintiffs' version of the facts to dispose of the motions, the allegations and contentions of neither party qualify as evidence for the summary judgment motions. The court looks to the affidavits to determine whether material fact issues exist.

The Saudi Arabian royal family recruited Josephine Alicog and Sriyani Marian Fernando from their home countries in Asia to become servants in Saudi Arabia. In July 1991, the two accompanied Prince Saad, the king's brother, on his trip to Houston for medical treatment. Sponsored by the prince, they were admitted into the United States on B-1 visas.

When Alicog and Fernando entered the United States at Houston, the American immigration officer handed their passports and travel papers to Saudi consular officers. The consular officers did not return the papers to the two women after they cleared customs.

Before the prince arrived in Houston, he hired Majid Afifi, a Texan, to book rooms in the Ritz–Carlton and furnish limousine service. He also hired Afifi's brother Salim, another Texan, to furnish security through an independent contractor. The security service was paid directly by the Saudi Consulate. The plaintiffs say Salim Afifi was paid a fee for each guard who worked for the prince.

In Houston, on orders from the Consul General and Majid Afifi, the contract guards prevented Fernando and Alicog from leaving the hotel unless accompanied by a guard. One guard, Ron Smith, testified that the Consul General and the Afifis themselves were repeating orders from the prince. The former president of the security services company testified that the plaintiffs moved freely throughout the hotel. Also at one point, one of the hired drivers told a guard to keep one of the plaintiffs from leaving.

In addition, the two say they were physically and mentally abused by members of the royal family, security guards, local law enforcement officers hired by the prince, and consular employees. None of these abusers has been identified nor has objective evidence of abuse been presented.

After five months in Houston, the two left the Ritz–Carlton unimpeded. When the plaintiffs requested their passports and travel papers, consular officers refused to deliver them. They then sued Prince Saad and Princess Noora in Texas court. Prince Saad died in July of 1993. Two years after the first lawsuit began, Alicog and Fernando sued King Fahd, the Kingdom of Saudi Arabia, and the Afifis in state court. The king and kingdom removed that case to federal court.

3. *Motions*

The king has moved to dismiss because, as the head of a state, he is immune from jurisdiction. The kingdom has moved to dismiss on two grounds. First, the jurisdiction of United States courts does not extend to the discretionary acts of government employees, and, second, no non-discretionary tortious acts are legally attributable to the government. Because both parties have supplemented their briefs with post-trial affidavits, the kingdom's motion to dismiss will be treated as a motion for summary judgment. The Afifis, claiming there is no evidence of their knowing involvement in any tortious acts, have moved for summary judgment.

### 4. *Head-of-State Immunity.*

■ Under long-standing international law, the head of a state as recognized by the executive branch of the United States government is immune from personal jurisdiction in United States courts unless that immunity has been waived by our statute or by the foreign government. *See* 28 U.S.C. § 517 (1966); *Saltany v. Reagan,* 702 F.Supp. 319, 320 (D.D.C.1988); *Lafontant v. Aristide,* 844 F.Supp. 128, 131–32 (E.D.N.Y. 1994). The immunity extends only to the person the United States government acknowledges as the head of state. *See Lafontant,* 844 F.Supp. at 132. Even if there were a dispute about the actual government in Saudi Arabia, this court must accept the recognition by the United States as conclusive.

Because there is no dispute and, in any event, because the United States has appeared in this action to acknowledge that King Fahd is the head of state of Saudi Arabia, the king's motion to dismiss will be granted.

### 5. *Foreign Sovereign Immunities Act.*

Since 1976 the Foreign Sovereign Immunities Act has defined the boundaries of jurisdictional immunity for foreign states. It allows for a broad shield of immunity from state and federal judicial jurisdiction in this country. *See* 28 U.S.C. § 1604 (1976).

■ The statute has several exceptions to this general immunity. The broadest exception is that jurisdiction exists for claims arising from commercial activity by the foreign state. The exception for commercial activity covers acts like government-owned airline crashes and breaches of materials contracts by government-owned enterprises. *See, e.g., Robert Bosch Corp. v. Air France,* 712 F.Supp. 688 (N.D.Ill.1989); *Matter of Sedco, Inc.,* 543 F.Supp. 561 (S.D.Tex.1982).

■ Another exception allows jurisdiction for claims arising from personal injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1605 (1988). For example, the government driver who negligently causes a wreck on his way to pick up lunch for the press staff renders the government liable. On the other hand, that same employee who causes a wreck during his own free time may be personally liable, but the government is left immune.

### 6. *Discretionary Tort Exception.*

■ Were the statute to say no more, the consular officers' assistance in keeping the plaintiffs in the hotel and in abusing them would be actionable, and the kingdom would be liable for the plaintiffs' personal injuries in the course of the consular agents' duties. The tort exception itself has exceptions. One exception extends immunity if the tort occurs during the performance of a discretionary function.

Before 1976, the executive branch determined whether the foreign government was immune from jurisdiction under each case's particular facts and our policy interests. The FSIA, however, moved the resolution of immunity issues to the judiciary. As a result of this shift, the courts are to determine what distinguishes a discretionary function from ministerial or operational activities. *See, e.g., Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 372 (7th Cir.1985).

### 7. *Discretion.*

■ A court determines whether an act is discretionary by asking whether there was a choice of conduct that was grounded in social, economic, or political policy. *See, e.g., Risk v. Halvorsen,* 936 F.2d 393, 395 (9th Cir.1991). The Saudi officers' retention of the plaintiffs' travel papers at the airport qualifies as a discretionary function. A primary reason for a consulate's existence is to handle travel documents of both its citizens and others. What governments do with a person's travel papers is an element effectuating policy and, as a result, is among the discretionary functions.

The refusal to return the travel documents even after the plaintiffs had left the service of their visa sponsor still qualifies as a discretionary function. Again, what consular officers do with travel documents at any time is a policy-affecting function. Judicial interference with this core of a foreign govern-

ment's diplomatic operation is precisely what the FSIA and this country's traditional foreign relations policies are meant to eliminate. Regardless of who the parties may be, resolution of passport disputes should flow through executive channels and not through judicial backwaters. The plaintiffs may seek redress not in United States courts but from American, Saudi, Filipino, or Sri Lankan diplomats.

Also, the plaintiffs could have returned to their home countries without their original travel documents. Without too much trouble they could have gotten temporary replacement documents from their countries' consuls in Houston. Furthermore, the plaintiffs were in the United States on B–1 visas, and no American immigration official would have prevented them from leaving the country.

The plaintiffs rely on another court's having decided that a government was not immune for the negligence of a pilot flying a plane owned and operated by the Mexican government, even though the plane was carrying only prisoners and guards as part of government policy. The government was liable not for a choice of policy but for a physical mistake that occurred in carrying out the policy. The plaintiffs in this case sued because of the way policy affected them. They did not seek compensation for some mistake in carrying out that policy. *Compare Olsen v. Government of Mexico*, 729 F.2d 641 (9th Cir.1984).

### 8. *Imprisonment and Abuse.*

On the charges of imprisonment and abuse, the plaintiffs appear to have a stronger case. The law has imposed limits on the exception for discretionary functions. *See, e.g., Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir.1989) (discretion does not include violation of the foreign state's own laws); *Letelier v. Republic of Chile*, 488 F.Supp. 665, 671–74 (D.D.C.1980) (foreign state's design for an assassination abroad exceeded legitimate diplomatic function).

■ Some confusion exists about this limitation. When Norwegian consular officials assisted a Norwegian national in violating a state court's order not to leave the United States with his children during a custody battle, the consular officer who assisted the kidnapping was held to be immune. *See Risk v. Halvorsen*, 936 F.2d 393, 397 (9th Cir.1991) (holding that not all illegal acts fall outside the scope of the discretionary function). That result was simply wrong. Kidnapping, private imprisonment, and assassination are all beyond the scope of legitimate diplomatic operations and are not protected by the discretionary function exception, and courts have jurisdiction over a government committing those acts.

■ Nevertheless, keeping the plaintiffs in the hotel did not exceed the boundaries of discretion. The Saudi government says that its concerns about INS regulations prompted the detention. Although no INS regulation holds governments responsible for B–1 visa defectors, it does not follow that the consular officer exceeded discretionary function limits. The United States allowed the plaintiffs into this country only because they worked for a Saudi. It was not unreasonable then for the consul general to think that the United States would prefer he prevent their defections or that his supervisors in Riyadh would disapprove of an incident with the United States.

Crediting temporarily the testimony from Ron Smith that "the Consulate [*sic*] General was acting on orders from the Prince" does not change this conclusion. That the prince ordered the plaintiffs' detention does not mean that the consul general did not have his own reasons for carrying out the orders. If there is a discretionary basis for the government's acts, it does not matter where the concept or command for them originated. There is discretion when the police, following "orders" from a private citizen, stop a raucous party.

The plaintiffs insist on calling their detention "enslavement," yet there is no evidence to justify that appellation. In addition to moving freely throughout the luxury hotel, they could leave the hotel accompanied by guards with the prince's permission. By their own admission, the plaintiffs became good friends with some of the local law enforcement officers hired by the prince. It is impossible that in the five months in Houston

the plaintiffs, who spoke English, never had a chance to use a telephone, send a message, or ask these officers for help. For the treatment of the plaintiffs to qualify as an actionable offense against a foreign government, there must be evidence of acts more egregious than the confinement of two people in one of Houston's ritziest hotels.

### 9. *Serious Criminal Acts.*

■ The kingdom would not be immune if the consular officers committed serious physical abuse. *See, e.g., Letelier,* 488 F.Supp. at 673 (a serious criminal act exceeds discretion). While the single slap of a servant's face would not constitute a serious criminal act, a murder would.

■ The plaintiffs testified that they were mentally and physically abused several times by the royal family, guards, and consular officers. Their testimony is vague at best, with no specification of who did precisely what to whom, where, and on what occasion. Six months of enslavement and torture, as the plaintiffs would have it, must have some detail, some objective residue somewhere.

They have presented no evidence, however, of this abuse. If the damage were serious enough to warrant judicial scrutiny, there must have been hospital records, pictures, scars, or testimony from others about the extent of harm. In particular, the plaintiffs present no specific evidence that it was even government officers who abused them. Eighteen months in state court should have yielded some evidence about who in particular abused them. If, after all these proceedings, the plaintiffs have no evidence of abuse, only allegations, this court cannot provide redress.

The plaintiffs say that they need more time for discovery. This court has denied that request. The plaintiffs have not identified their assailants nor have they specified the assailants' connections to the kingdom. While the court recognizes the difficulty these plaintiffs may have in obtaining discovery from the kingdom, they have deposed the prince, and consular officials, contract guards, local law officers, and others have been within subpoena range since the filing of the original suit. The plaintiffs have developed all the facts that they can, and they are not enough.

Since the plaintiffs cannot show that the consular officers exceeded discretionary function limits by committing serious criminal acts, the Saudi government will be dismissed.

### 10. *The Afifis.*

■ Neither Majid Afifi nor Salim Afifi is liable for what happened to Fernando and Alicog.

Ron Smith testified that both the consul and Majid Afifi told the security guards of Prince Saad's orders to keep the plaintiffs in the hotel. Since the consulate paid the guards, they were agents of the Saudi government. When both a government official and a private citizen order government employees to perform the same function, the private citizen cannot be held liable at the same time the official and employees are immune. Even if the government official just mimics the private citizen, the ordered acts are still a government's when governmental agents perform functions that are both within the scope of their employment and are sanctioned by their superior.

Afifi could be liable, however, if the employees had acted outside the scope of their employment. When they act outside the scope of their employment, the employees' acts are no longer attributable to their government. As a result, the employees and those directing them are not immune from United States courts. *See Skeen v. Federative Republic of Brazil,* 566 F.Supp. 1414 (D.C.C.1983).

One might fear a foreign government that commits criminal acts on behalf of its citizens or American nationals to immunize them from jurisdiction. Three constraints would impede that government:

   A. The United States executive branch may act through diplomatic channels;

   B. Limitations on a government's discretion apply; and

   C. The government employees must still be within the scope of their employment.

### 11. *Majid Afifi's Orders.*

■ Also worth noting about Majid Afifi's potential liability are the particular orders he gave. Afifi did not command guards to lock the plaintiffs in their rooms, to chain them to walls, or to hit them. He merely repeated the prince's request that the plaintiffs not leave the Ritz–Carlton without the prince's permission and an accompanying guard. For a false imprisonment claim to succeed, there must be more evidence than just being restricted to the Ritz–Carlton or accompanied by a guard. When the president of a company orders his operations chief to prevent the office staff from entering a company warehouse without being escorted by company guards, the president is not imprisoning anyone.

Faultless for his orders to the guards, Afifi is also free from liability for his driver's actions. That the driver told security guards to "detain" Fernando does not establish that Afifi had given some original orders; whether he gave orders other than repeating the prince's is not alleged. Whether the driver was transmitting commands from the consul or was merely reminding the guards of the prince's policy, the driver and his supervisor, Afifi, were acting as agents of the kingdom.

Equally insufficient is the claim that Majid Afifi assumed responsibility for the prince's entourage during its stay in the hotel. Afifi told the hotel management he would curb the lewd behavior of one person in the prince's party, but that is irrelevant, especially since the behavior had nothing to do with the plaintiffs or their claim. This is a naked red herring.

To survive a motion for summary judgment, the plaintiffs need more evidence than Majid Afifi's one order to the security guards, his driver's alleged command, and his answering for another's behavior. Majid Afifi's motion for summary judgment will be granted.

### 12. *Salim Afifi.*

■ Respondeat superior does not apply to someone who was paid a commission for bringing together two other parties when those two later injure a third party. Salim Afifi did no more than find an independent contractor to furnish security guards for the prince. The consulate, not Afifi, paid this independent contractor. There is also no evidence to support the claim that Afifi played a role in keeping the plaintiffs in the hotel. As a result, Salim Afifi is not liable for any of the guards' acts.

Salim Afifi's motion for summary judgment will be granted.

### 13. *Conclusion.*

The plaintiffs bring serious allegations. American courts cannot hide behind the discretionary function exception to escape hearing allegations of murder, kidnapping, and enslavement that are supported by evidence; on the other hand, the courts cannot invade the executive and legislative prerogative by keeping cases alive that fall within the discretionary function exception, even if they contain scandalous allegations of multiple wrongs. This case belongs to the latter group, and will be dismissed.

#### FINAL JUDGMENT

Josephine Alicog and Sriyani Marian Fernando take nothing from King Fahd, the Kingdom of Saudi Arabia, Majid Afifi, and Salim Afifi.