Donahue v. United States, 660 F.3d 523, 526 (1st Cir. 2011) (en banc ) (Torruella, J., *955 concerning the denial of en banc review) (emphasis in original) (citations omitted).[9]
Although this Court remains mindful of the binding nature of the determinations by the Supreme Court and the Fourth Circuit that the federal government may not be sued in tort without its consent, the deeper understanding of the history and development of sovereign immunity doctrine, as well as the contemporary practice in other countries and the academic and judicial criticism of the path the United States has taken, contextualizes the question presented by the government's motion to dismiss CACI's Third-Party Complaint.
2. Jus Cogens Norms
a. Development of Jus Cogens Norms
Jus cogens norms are defined as those "peremptory norms" that "are nonderogable and enjoy the highest status within international law." Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 940 (D.C. Cir. 1988) ; see also Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention")[10] (defining a jus cogens norm as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character"). Such norms come first from "customary international law," which is a body of law that "results from a general and consistent practice of states followed by them from a sense of legal obligation." Comm. of U.S. Citizens, 859 F.2d at 940 (quoting Restatement (Third) of Foreign Relations Law § 102(2) (Am. Law Inst. 1987) ). Once a necessary number of states determine that a particular rule should have the force of international law, that rule is incorporated into customary international law, which is therefore "continually evolving." Id. After a norm has been incorporated into customary international law, it may become a jus cogens, or peremptory, norm if there is "a further recognition by the international community as a whole that this is a norm from which no derogation is permitted." Id. (alterations, internal quotation marks, and citation omitted). Once a norm has achieved the status of jus cogens, it assumes a place at the top of the hierarchy of international norms, such that no state is permitted to derogate from the norm and any treaty or other agreement is void if it conflicts with the norm. See Vienna Convention art. 53; Comm. of U.S. Citizens, 859 F.2d at 940.
The development of the concept of jus cogens norms has proceeded as the "status of individuals under international law has undergone a fundamental change" since World War II, such that "individuals are now said to possess substantive international rights vis-a-vis states." Belsky et al., supra, at 393. This change has corresponded *956 with a shift in the emphasis of international law from "the formal structure of the relationships between States and the delimitation of their jurisdiction to the development of substantive rules on matters of common concern vital to the growth of an international community and to the individual well-being of the citizens of its member States." Id. at 392-93 (quoting Wilfred Jenks, The Common Law of Mankind 17 (1958) ). As a result, the "irreducible element" of international law has become "the sovereignty of the individual, not the sovereignty of states." Id. at 393.
Against this backdrop, jus cogens norms have developed as an expression of the international community's recognition that all states are obligated, in their capacity as states, to respect certain fundamental rights of individuals. Although the exact content of the set of jus cogens norms is debatable, it is clear that certain "fundamental human rights law[s]," such as those that "prohibit[ ] genocide, slavery, murder, torture," and similarly universally condemned practices, have achieved the status of jus cogens. Comm. of U.S. Citizens, 859 F.2d at 941. In particular, "[t]orture is widely recognized as contravening jus cogens," and "[a]ll major human rights agreements and instruments contain a prohibition against torture" that "is non-derogable." Karen Parker & Lyn Beth Neylon, Jus Cogens: Compelling the Law of Human Rights, 12 Hastings Int'l & Comp. L. Rev. 411, 437-38 (1989).
b. Jus Cogens Norms and Foreign Sovereign Immunity Law
Although there is no American case law exploring the interplay between violations of jus cogens norms and federal sovereign immunity, the problem of reconciling the peremptory status of jus cogens norms with assertions of immunity from suit has repeatedly vexed foreign, international, and domestic courts in the context of foreign sovereign immunity-that is, the ability of one state to claim immunity from being sued in the courts of another state.
The current position of customary international law on this issue was described in a case in 2012, in which a divided International Court of Justice held that it was a violation of international law for Italian courts to refuse to extend state immunity to Germany with respect to claims brought by Italian citizens for alleged jus cogens violations during World War II. Jurisdictional Immunities of the State (Ger. v. It.; Greece Intervening ), Judgment, 2012 I.C.J. 99, ¶ 95 (Feb. 3). Although the court recognized that jus cogens norms preempt any contradictory substantive rules, it held that "the rules which determine the scope and extent of jurisdiction and when that jurisdiction may be exercised do not derogate from those substantive rules which possess jus cogens status," which meant that the customary international rule that states generally enjoy immunity from being sued in the courts of another state prohibited Italy from exercising jurisdiction over a nonconsenting Germany, notwithstanding the jus cogens nature of the norms at issue. Id.
This International Court of Justice decision is generally in accord with other international law decisions on the subject. For example, in 2001, the European Court of Human Rights confronted a case in which a dual British and Kuwaiti national alleged that he was tortured by Kuwaiti officials in Kuwait and attempted to sue Kuwait and various Kuwaiti officials in the British courts. Al-Adsani v. U.K., 2001-XI Eur. Ct. H.R. 79, ¶¶ 9-16. The British courts found that the State Immunity Act of 1978, which governs the exercise of jurisdiction over foreign sovereigns in British courts, did not permit such a suit, id. ¶ 18, and the European Court of Human Rights upheld *957 that decision, ruling that the United Kingdom did not violate international law by declining to exercise jurisdiction over Kuwait to allow for the redress of the jus cogens violations, id. ¶ 66. In particular, the court did not "find it established that there is yet acceptance in international law of the proposition" that one state is not entitled to claim sovereign immunity in the courts of another state "for damages for alleged torture committed outside the forum" state. Id. ¶ 66. Similarly, a Canadian court has held that the plain language of the State Immunity Act, which governs grants of sovereign immunity to foreign states sued in Canadian courts, does not allow for a foreign state to be sued for torture that allegedly occurred in that foreign state and that international law did not compel the court to exercise jurisdiction despite the plain language of the act. Bouzari v. Iran, [2002] O.J. No. 1624, para. 69 (Can. Ont. Sup. Ct. J.). In so holding, the court interpreted the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. 100-20, 1465 U.N.T.S. 85 ("Convention Against Torture"), to require states to "provide a remedy for torture committed within their jurisdiction" but not to "require a state to provide a civil remedy for acts of torture by a foreign state outside the forum." Id. paras. 51, 54. In addition, the court conducted a survey of international and foreign court decisions and determined that the majority of those decisions held that "to promote comity and good relations between states," a state should be granted immunity from civil suit in the courts of another state, even where torture or other jus cogens violations are considered. Id. para. 69. Accordingly, the court held that the plaintiff could not bring suit in Canadian courts against a foreign state for torture that occurred outside of Canada.
Similarly, American courts have generally refused to interpret the FSIA to waive sovereign immunity in American courts for all jus cogens violations committed by a foreign state. In 1992, the Ninth Circuit held that former Argentine residents could not pursue a lawsuit against Argentina to seek redress for torture and expropriation of property because the FSIA explicitly grants immunity to foreign sovereigns in all cases that do not come within one of the specifically enumerated exceptions, 28 U.S.C. § 1604, and violations of jus cogens norms are not one of the exceptions. Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 704, 718-19 (9th Cir. 1992).
Following this logic, a divided panel of the D.C. Circuit held two years later that a Holocaust survivor could not sue Germany in an American court "to recover money damages for the injuries he suffered and the slave labor he performed while a prisoner in Nazi concentration camps." Princz v. Federal Republic of Germany, 26 F.3d 1166, 1168 (D.C. Cir. 1994). The court specifically examined whether the case fell into the "waiver exception" in the FSIA, which provides that there is no sovereign immunity where "the foreign state has waived its immunity either explicitly or by implication." Id. at 1173 (quoting 28 U.S.C. § 1605(a)(1) ). The court rejected the argument "that the Third Reich impliedly waived Germany's sovereign immunity under the FSIA by violating jus cogens norms of the law of nations" because a "foreign state that violates these fundamental requirements of a civilized world thereby waives its right to be treated as a sovereign," finding that the legislative history of the implied waiver provision indicated that any such waiver must be intentional, such as by filing a responsive pleading without raising an immunity defense or agreeing to a choice of law provision. Id. at 1174 ; see also *958 Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1155-56 (7th Cir. 2001) (holding that Congress did not intend for the FSIA to create an immunity exception for all jus cogens violations); Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 243-44 (2d Cir. 1996) (holding that the violation of a jus cogens norm did not trigger the implied waiver provision because the examples of implied waivers in the legislative history of the FSIA all involve litigation-adjacent conduct, which the court deemed to be "persuasive evidence that Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation").
Accordingly, in both the international and domestic contexts, there is general, though not unanimous, agreement that a state may not be sued in the courts of a foreign state for conduct, including jus cogens violations, that occurred outside the forum state. Such a rule not only promotes comity and international respect among sovereigns, but it also avoids the problem of global forum-shopping that would accompany any regime of truly universal jurisdiction. That being said, at least some of the foreign cases include an implicit understanding that although sovereign immunity might defeat the exercise of jurisdiction by a state with no connection to the underlying conduct, it may not appropriately bar relief in the courts of a state with a jurisdictional nexus to the jus cogens violation.
3. Jus Cogens and Domestic Sovereign Immunity
With this background in mind, it is now appropriate to address the essential question presented by the United States' Motion to Dismiss, which is whether the federal government retains sovereign immunity that protects it from being sued in an American court for alleged jus cogens violations committed by Americans. For the reasons that follow, this Court concludes that the United States does not retain such immunity.
a. Rights and Remedies
Jus cogens norms not only carry with them an obligation on the part of states to respect the norms but also confer an unquestionable right on each individual to be free from states violating those norms. This right, which is created by international law, is binding on the federal government and enforceable in the federal courts, and the basic axiom that where there is a right, there must be a remedy leads to the conclusion that the government has waived its sovereign immunity with respect to alleged jus cogens violations.
The basic principle that international law is incorporated into American law and is binding on the federal government and enforceable by American courts is as old as the Republic itself. In 1796, the Supreme Court "held that the United States had been bound to receive the law of nations upon declaring its independence," which meant that "the United States was required" to recognize international norms when those norms were recognized by all other nations. David F. Klein, Comment, A Theory for the Application of the Customary International Law of Human Rights by Domestic Courts, 13 Yale J. Int'l L. 332, 338 (1988) (citing Ware v. Hylton, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796) ); see also Jules Lobel, The Limits of Constitutional Power: Conflicts Between Foreign Policy and International Law, 71 Va. L. Rev. 1071, 1084 (1985) ("The early American leadership believed that the attainment of independence obligated the United States to receive and to follow the law of nations."). Indeed, at the time of the Founding, American law was expected to conform to the dictates of international *959 law. "Early federal court cases also suggested that laws or executive actions in violation of international law were void," Lobel, supra, at 1087, and at least one state court permitted the indictment of a defendant for a violation of the law of nations, finding that law to be, "in its full extent, ... part of the law of th[e] State," Respublica v. De Longchamps, 1 U.S. (1 Dall) 111, 116, 1 L.Ed. 59 (Pa. Ct. Oyer & Terminer 1784). In a similar vein, the Supreme Court held in 1804 that an "act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804).
In the last two centuries, the principle that "federal common law incorporates international law" has become a "settled proposition." Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995). Over that time, "Supreme Court decisions, executive statements, and scholarly commentary have ... considered customary international law to be the law of the land." Lobel, supra, at 1072 ; see also The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination."). Moreover, because the "Constitution does not freeze international law to its state of development [as of] 1789," as international law has evolved to incorporate jus cogens norms, so too has federal common law. Belsky et al., supra, at 398; see also Sosa, 542 U.S. at 724, 124 S.Ct. 2739 (holding that the ATS is a jurisdictional statute "creating no new causes of action" but that the common law "provide[s] a cause of action for ... certain torts in violation of the law of nations"). Accordingly, there is today a federal common law right derived from international law that entitles individuals not to be the victims of jus cogens violations.
Once it is determined that jus cogens violations infringe on federal rights, it becomes clear that there must be a remedy available to the victims. Indeed, the "ancient legal maxim" ubi jus, ibi remedium-"[w]here there is a right, there should be a remedy"-is as "basic and universally embraced" today as it was two hundred years ago. Akhil Reed Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1485-86 (1987). As Chief Justice Marshall famously stated in Marbury v. Madison, "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." 5 U.S. (1 Cranch) at 163. In fact, not only did the early Supreme Court embrace this principle, but it was also endorsed by many state constitutions and in The Federalist Papers. See Amar, supra, at 1485-86. Since that time, the principle has been incorporated into the basic fabric of American law. Accordingly, by joining the community of nations and accepting the law of nations, the federal government has impliedly waived any right to claim sovereign immunity with respect to jus cogens violations when sued for such violations in an American court.[11]
*960 b. The International Enforcement Structure
In addition to this common law remedial imperative, the international enforcement structure mandated by various multilateral agreements to which the United States is a party and envisioned by foreign and international courts requires the United States to submit to suit in its own courts for certain jus cogens violations, especially those related to torture. By joining these agreements and participating in the international community, the United States has therefore impliedly waived its sovereign immunity with respect to such claims.
The Convention Against Torture, which the United States ratified in 1994, requires each state to "ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Convention Against Torture art. 14(1). Indeed, "[a]lmost all international human rights declarations and treaties, including those that are binding on the United States, impose an obligation on the State to provide compensation for violations of rights that occur." Denise Gilman, Calling the United States' Bluff: How Sovereign Immunity Undermines the United States' Claim to an Effective Domestic Human Rights System, 95 Geo. L.J. 591, 624 (2007) ; see also Velasquez Rodriguez Case, 1988 Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 174 (July 29, 1988) ("The State has a legal duty to take reasonable steps to prevent human rights violations and to use the means at its disposal to carry out a serious investigation of violations committed within its jurisdiction, to identify those responsible, to impose the appropriate punishment and to ensure the victim adequate compensation.").
In response to inquiries from the United Nations Committee Against Torture about whether the United States has taken appropriate steps to comply with its obligation "to ensure that mechanisms to obtain full redress, compensation and rehabilitation are accessible to all victims of acts of torture," the United States has explained that "U.S. law provides various avenues for seeking redress in cases of torture" and that, "as to torture specifically, the Torture Victim Protection Act ... created a cause of action in federal courts against" foreign officials who commit torture. United Nations Committee Against Torture, Convention Against Torture, Periodic Report of the United States of America (Third, Fourth, and Fifth Reports) (Aug. 12, 2013) ¶ 147, at 53. Although with respect to American officials and the federal government, neither of whom may be sued under the Torture Victim Protection Act, the government has explained to the Committee Against Torture that claims may be resolved through the military, id., it has not provided any information about how this resolution structure complies with its obligations under the Convention Against Torture. Moreover, in response to a request asking "whether the United States would consider authorizing jurisdiction by the Committee to receive and adjudicate complaints by individuals claiming to have suffered human rights violations committed by the United States," the government refused to *961 consent to such jurisdiction on the basis that the domestic legal system provides an adequate remedy for such individuals. See Gilman, supra, at 602. Because the Westfall Act provides that a suit against the government is the exclusive remedy for torts committed by government officers in the course of their government employment, victims who were tortured by American government or military personnel are unable to sue the torturers directly. See Ameur v. Gates, 950 F.Supp.2d 905, 914-18 (E.D. Va. 2013) (holding that the United States had properly substituted itself as a defendant under the Westfall Act where the plaintiff, who alleged various jus cogens violations including torture, had named individual government officers as defendants), aff'd, 759 F.3d 317 (4th Cir. 2014). As such, allowing the United States to assert sovereign immunity as a defense to such claims would ensure that the domestic legal system does not provide an adequate remedy to victims of torture. Cf. Gilman, supra, at 634 (explaining that the European Court of Human Rights has held that blanket immunities amount "to an unjustifiable restriction on an applicant's right to have a determination on the merits of his or her claim" and that courts must examine claims "on the merits in an adversarial proceeding that would require the [government actors] to 'account for their actions and omissions' rather than to dismiss those claims on immunity grounds" (quoting Osman v. United Kingdom (No. 95), 1998-VIII Eur. Ct. H.R. 3124, 3170-71) ). Accordingly, by ratifying the Convention Against Torture and assuring the Committee Against Torture that an adequate civil remedy exists for such victims, the United States has impliedly waived its sovereign immunity with respect to such claims.
This conclusion is further reinforced by the international prosecution structure envisioned by these agreements and effected by international and foreign courts. Article 5 of the Convention Against Torture provides that each state party "shall take such measures as may be necessary to establish its [criminal] jurisdiction over" torture-related offenses where the offenses occur within the territory of the state, where the offender is a state national, or "where the alleged offender is present in any territory under its jurisdiction and it does not extradite him." Convention Against Torture art. 5(1)-(2). This provision establishes a structure whereby each state party to the Convention is required to assume criminal jurisdiction over all cases with a strong jurisdictional nexus to the state-where the offender is a national or the offense occurred within the state-and is also required either to extradite or prosecute offenders who are not nationals and who did not engage in the criminal conduct within the state but who are found in the state's territory. Read together, these rules establish a logical structure for criminal prosecution of those engaged in torture: when possible, prosecution should take place in a state with a strong jurisdictional interest in the case, but when that is not possible, prosecution may take place in any state where the offender is found or to which the offender can be extradited.
Although not specifically required by the Convention Against Torture, courts have effected a similar remedial structure for civil torture claims against states. By refusing to exercise jurisdiction over foreign states where the conduct in question occurred outside the forum, courts have determined that civil suits should, like criminal prosecutions, proceed in the courts that have the strongest jurisdictional nexus to the conduct. Typically, those courts would be in the state that allegedly carried out the torture or where the torture *962 allegedly occurred. Unlike in the case of criminal prosecutions, there is no universal jurisdiction safety valve where such a court is unable or unwilling to exercise jurisdiction. Accordingly, to effectuate the global remedial structure apparently envisioned by the Convention Against Torture, it is necessary for those courts with a nexus to alleged torture to exercise jurisdiction over victims' civil claims. In this case, the United States has decreed that it and its personnel are not subject to the jurisdiction of Iraqi courts for conduct arising out of the occupation of Iraq, see Memorandum Opinion [Dkt. No. 678] 51 (explaining that Coalition Provisional Authority Order 17 directs that injured parties, such as plaintiffs, may not bring claims arising from coalition activities in Iraqi courts because "occupying powers ... are not subject to the laws or jurisdiction of the occupied territory" (citation omitted) ), which leaves American courts as the only courts with a jurisdictional nexus to such claims. Therefore, to effectuate the international enforcement structure envisioned by the Convention Against Torture and affirmed by international and foreign courts, it is necessary for American courts to exercise jurisdiction over civil claims arising out of alleged torture by American personnel in Iraq.[12] Accordingly, by becoming a party to the Convention Against Torture, the government has impliedly waived any sovereign immunity defense that would prevent such enforcement.
c. Hierarchy of Norms
The place of jus cogens norms at the top of the hierarchy of international law norms and their status as obligatory and overriding principles that invalidate any contradictory state acts, as well as their development from the ashes of World War II, provide an additional reason that the United States does not have sovereign immunity here.
Jus cogens norms "enjoy the highest status within international law," and their supremacy "extends over all rules of international law." Siderman de Blake, 965 F.2d at 715-16 (internal quotation marks and citation omitted). Accordingly, these norms "prevail over and invalidate international agreements and other rules of international law in conflict with them." Id. (internal quotation marks and citation omitted). As one specific example, it is unquestionable that jus cogens norms *963 "limit the scope of treaties, such that a treaty concluded in violation of a jus cogens norm [i]s null and void." Belsky et al., supra, at 390. Because the concept that a sovereign may claim immunity from suit "itself is a principle of international law," Siderman de Blake, 965 F.2d at 718, the peremptory status of jus cogens norms means that when sovereign immunity and jus cogens norms conflict, the sovereign immunity principle must give way. See id. (concluding that as "a matter of international law, [this] argument carries much force"). In this case, the two norms conflict because the jus cogens norms in question inherently include not only a rule prohibiting states from torturing individuals but also necessarily a rule requiring an effective means to redress that violation. Without such a remedial principle, the prohibitory norm itself would be toothless and, given the recognized importance of ensuring adherence to jus cogens norms, any interpretation defanging the norm would impermissibly "undo what [the international community] has done" in implementing the norm. King v. Burwell, --- U.S. ----, 135 S.Ct. 2480, 2496, 192 L.Ed.2d 483 (2015). So interpreted, any jus cogens norm must prevail over and invalidate any principle allowing the assertion of sovereign immunity in response to claims of jus cogens violations.[13]
Moreover, the circumstances surrounding the development of the concept of peremptory norms-ones that can bind all states even without their explicit consent and even with regard to domestic conduct-provide additional force to the conclusion that sovereign immunity must give way in the face of violations of such norms. The concept of such binding norms arose in the wake of World War II and the Nuremberg trials. Before the atrocities committed by Nazi Germany, "a state's treatment of its own citizens was considered immune from the dictates of international law." Princz, 26 F.3d at 1182 (Wald, J., dissenting). The Nuremberg trials, in which German officials were prosecuted for crimes against humanity, including crimes against German citizens, "permanently eroded any notion that the mantle of sovereign immunity could serve to cloak an act that constitutes a 'crime against humanity,' even if that act is confined within the borders of a single sovereign state." Id. These prosecutions "forced the world to acknowledge that, even absent formal expressions of certain international principles in the past, the rule of reason required the conviction of Nazi war criminals" and, more generally, represented an acceptance by the global community of the idea that rules "appealing to normative values, such as human rights principles, do not depend on the will of the governing executive or legislative authority for their legality; they are part of the common law." Klein, supra, at 348, 352. As the International Military Tribunal at Nuremberg explained:
The principle of international law, which under certain circumstances, protects the representatives of a State, cannot be applied to acts which are condemned as criminal by International Law. The authors of these acts cannot shelter themselves *964 behind their official position in order to be freed from punishment in appropriate proceedings.... [T]he very essence of the Charter [of the International Military Tribunal] is that individuals have international duties which transcend the national obligations of obedience imposed by the individual State. He who violates the laws of war cannot obtain immunity while acting in pursuance of the authority of the State if the State in authorizing action moves outside its competence under International Law.... The provisions of [the Charter of the International Military Tribunal providing that acting pursuant to a superior's order is not a defense to criminal liability] are in conformity with the law of all nations. That a soldier was ordered to kill or torture in violation of the International Law of war has never been recognized as a defense to such acts of brutality ....
International Military Tribunal (Nuremberg), Judgment and Sentences (1946), reprinted in 41 Am. J. Int'l L. 172, 221 (1947). The principle at the heart of the Nuremberg trials, and the concomitant acceptance of the existence of certain peremptory norms, is simple and persuasive: there are some acts that are, as a matter of morality and reason, fundamentally wrong such that no state may authorize their commission nor immunize those involved in such acts from liability. This principle compels the conclusion that just as a government official is unable to cloak himself in the mantle of sovereign immunity to avoid prosecution when he commits a jus cogens violation, so too is a government unable to immunize itself from civil liability for such violations. And indeed, not only has the United States accepted the principles advanced at Nuremberg, it actually
led the way in these developments and must therefore accept domestically these legal limitations on national sovereignty. As Justice Jackson, the United States prosecutor at Nuremberg, stated, "[i]f certain acts in violation of treaties are crimes, they are crimes whether the United States does them or whether Germany does them, and we are not prepared to lay down a rule of criminal conduct against others which we would not be willing to have invoked against us." A complete deference by United States courts to executive orders or congressional acts irrespective of international law implications would be simply inconsistent with the spirit and rationale of Nuremberg.
Lobel, supra, at 1074 (alteration in original) (footnotes omitted). Accordingly, both by participating in the Nuremberg trials and the parallel development of peremptory norms of international law and by continuing to recognize the existence of such peremptory norms, the United States has waived its sovereign immunity for any claims arising from the violations of such norms.
d. Consent Through Membership in the Community of Nations
The United States has also consented to suit with respect to jus cogens violations by holding itself out as a member of the international community because the respect and enforcement of jus cogens norms are fundamental to the existence of a functioning community of nations. Jus cogens norms have been developed not only to safeguard the rights of individuals but also to provide an obligatory framework for ordering the relations of states because, as in any community, the "absolute protection" of "certain norms and values" is necessary for the "public order of the international community." Belsky et al., supra, at 387. Indeed, at least one "influential modern definition of jus cogens," which was *965 given by a delegate to the United Nations Conference on the Law of Treaties, frames jus cogens norms in precisely these terms: "The rules of jus cogens [are] those rules which derive from principles that the legal conscience of mankind deem[s] absolutely essential to coexistence in the international community." Parker & Neylon, supra, at 415 (alterations in original) (citation omitted). A similar "emphasis on the importance of jus cogens in maintaining the existence of international law" has been echoed by a variety of other authorities, including foreign court decisions. Id. at 415-16; see also Princz, 26 F.3d at 1181 (Wald, J., dissenting) (explaining that the "principle of nonderogable peremptory norms evolved due to the perception that conformance to certain fundamental principles by all states is absolutely essential to the survival of the international community" and that if "the conscience of the international community [were] to permit derogation from these norms, ordered society as we know it would cease"); Stefan A. Riesenfeld, Editorial Comment, Jus Dispositivum and Jus Cogens in International Law: In the Light of a Recent Decision of the German Supreme Constitutional Court, 60 Am. J. Int'l L. 511, 513 (1966) ("Only a few elementary legal mandates may be considered to be rules of customary international law which cannot be stipulated away by treaty. The quality of such peremptory norms may be attributed only to such legal rules as are firmly rooted in the legal conviction of the community of nations and are indispensable to the existence of the law of nations as an international legal order, and the observance of which can be required by all members of the international community." (quoting the German Supreme Court) ).
This function of jus cogens norms as the building blocks of an international legal order comes into considerable tension with the notion of sovereign immunity. In recognition of this inherent discord between the rule of law and unrestrained sovereignty, at least some commentators have described the introduction of jus cogens norms as "part of an ongoing struggle to move beyond unrestricted state sovereignty (that is, to establish an international rule of law)." Mary Ellen Turpel & Philippe Sands, Peremptory International Law and Sovereignty: Some Questions, 3 Conn. J. Int'l L. 364, 365 (1988). By continuing to engage with the international community, the United States has expressed a wish "to preserve the international order," which inherently involves "abdicat[ing] any 'right' to ignore or violate [jus cogens ] norms." Princz, 26 F.3d at 1181 (Wald, J., dissenting); see also id. at 1184 ("Adhering to such principles, now termed jus cogens norms, is an obligation erga omnes-an obligation of the state toward the international community as a whole-and by abdicating its responsibility to act in accordance with such norms, Germany consciously waived its right to any and all sovereign immunity." (footnote and citation omitted) ). Accordingly, by holding itself out as a member of the international community, the United States has impliedly waived its sovereign immunity for jus cogens violations because the continued deployment of such immunity would be fundamentally inconsistent with any desire to maintain an international legal order. Cf. Libyan Arab Jamahiriya, 101 F.3d at 242 & n.1 (concluding that the argument that "a state impliedly waives its immunity for jus cogens violations by holding itself out as a state within the community of nations," which is "premised on the idea that because observance of jus cogens is so universally recognized as vital to the functioning of a community of nations, every nation impliedly waives its traditional sovereign immunity for violations of such fundamental standards by the very act of *966 holding itself out as a state," is "appealing" and has been "persuasively developed").
e. The Character of Sovereign Acts
The United States also may not claim immunity for jus cogens violations because when government agents commit such violations, their actions are not sovereign in nature. Under international law, jus cogens norms are "by definition nonderogable," which means that the "rise of jus cogens norms limits state sovereignty in the sense that the general will of the international community of states, and other actors, will take precedence over the individual wills of states to order their relations." Princz, 26 F.3d at 1182 (Wald, J., dissenting) (internal quotation marks and citation omitted). As such, when "a state thumbs its nose at such a norm, in effect overriding the collective will of the entire international community, the state cannot be performing a sovereign act entitled to immunity" because such an act is fundamentally inconsistent with the obligations of every state. Id. In effect, "[i]nternational human rights law as a whole abrogates traditional notions of state sovereignty: states do not have the sovereign right to violate human rights." Parker & Neylon, supra, at 446; see also Belsky et al., supra, at 401 ("Nonrecognition is based on the principle that acts contrary to international law are invalid and cannot become a source of legal rights for the wrongdoer .... Because a state act in violation of a rule of jus cogens is not recognized as a sovereign act, the violating state has no legal right to claim immunity." (internal quotation marks and footnotes omitted) ). Any other conclusion would be "senseless," as it would be illogical to argue that "on account of the jus cogens value of the prohibition against torture, treaties or customary rules providing for torture would be null and void ab initio." but a state may take "national measures authorising or condoning torture or absolving its perpetrators." Prosecutor v. Furundžija, No. IT-95-17/1-T (Dec. 10, 1998), ¶ 155, reprinted in 38 I.L.M. 317, 349; see also id. (concluding that the jus cogens prohibition on torture "serves to internationally de-legitimise any legislative, administrative or judicial act authorising torture"). Therefore, when the United States violates jus cogens norms, it is not acting as a state must, and the violative acts do not have the sovereign character necessary to confer immunity.
This principle has been persuasively applied by at least two district courts in the FSIA context. In Liu v. Republic of China, 642 F.Supp. 297 (N.D. Cal. 1986), the court denied a motion to dismiss under the FSIA's discretionary function exception in a lawsuit where the plaintiff's representative alleged that the plaintiff was killed in California at the direction of Chinese officials. Id. at 305. The court held that "planning and conducting the murder of Henry Liu could not have been a discretionary function as defined by the FSIA" because the "killing of Americans residing in the United States is not a policy option available to foreign countries." Id. In short, China "and its agents simply did not have the discretion to commit the acts alleged." Id. Similarly, in Letelier v. Republic of Chile, 488 F.Supp. 665 (D.D.C. 1980), the court found that the discretionary function exception did not bar a suit against Chile stemming from its alleged participation in the assassination of a Chilean official in Washington, D.C. because "there is no discretion to commit, or to have one's officers or agents commit, an illegal act." Id. at 673. In the words of the court: "Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is *967 clearly contrary to the precepts of humanity as recognized in both national and international law." Id. Although both Liu and Letelier involved the question whether certain violations of international law could constitute discretionary acts that allowed the foreign government to retain sovereign immunity under the statutory scheme of the FSIA, which is a slightly different concern from the question presented in this civil action, the "fundamental premise" underlying both decisions "is that, although political assassination can be viewed as a public act by a state, there is a strong international consensus that such acts are not sovereign acts." Belsky et al., supra, at 400. Accordingly, "the acts, although performed by the government, were not recognized as state acts under national and international law." Id. Similarly, when the United States government commits acts that violate jus cogens norms, it is not acting in a sovereign capacity, which means that it is not entitled to immunity for such acts.
This conclusion is reinforced by the nature of sovereignty in the American system. Since the Founding, Americans have recognized that "indivisible, final, and unlimited authority," i.e., sovereignty, rests in the People, not the government. See Amar, supra, at 1435-37. Accordingly, when speaking of the "government as sovereign," the Founders "mean[t] sovereign in a necessarily limited sense" because "[b]y definition, government's sovereignty was bounded" to "its sphere of delegated power." See id. at 1437.[14] Therefore, the federal government may only exercise power that has been legitimately delegated to it by the People.
Moreover, at the Founding, even those with expansive views of sovereign immunity recognized that the ability to claim sovereign immunity was bounded by substantive lawmaking power. As Justice Iredell argued in dissent in Chisholm, Georgia's sovereign immunity was "exactly coextensive with her derivative 'sovereign' lawmaking capacity: A state could use its lawmaking power to adopt rules immunizing itself from liability, as long as such immunity frustrated no higher-law restrictions on the state's limited sovereignty." See id. at 1472. Accordingly, by the very nature of limited sovereignty, governments may "choose to exercise their sovereign power by immunizing themselves from rules that apply to private citizens" only when acting "within the scope of their delegated authority." Id. at 1490. On the other hand, when republican "governments act ultra vires and transgress the boundaries of their charter," they have no sovereign power to immunize themselves. Id.
Putting these two conclusions together: the federal government may immunize itself from liability for jus cogens violations only if the acts of authorizing or engaging in such violations fall within the sphere of *968 authority that has been legitimately delegated by the People. Under the principles of international law discussed in this section, the People as sovereign are bound by the nonderogability of jus cogens norms, which means that the People may not legitimately delegate to the government the power to engage in jus cogens violations. Accordingly, the federal government, bounded by its status as a limited government of delegated powers, has no sovereign power to immunize itself from liability for such violations.
For these reasons, the United States does not retain sovereign immunity for violations of jus cogens norms of international law. Because Counts 1-3 in the Third-Party Complaint are derivative of plaintiffs' claims that CACI employees conspired with and aided and abetted the federal government in violation of jus cogens norms, CACI's assertion of these counts against the United States is not barred by sovereign immunity, and the government's Motion to Dismiss will be denied as to Counts 1-3.
D. Sovereign Immunity and CACI's Contract Claim
Unlike the claims in Counts 1-3, CACI's contract claim in Count 4 is not derivative of plaintiffs' claims for violations of jus cogens norms. Instead, in Count 4, CACI alleges that the government has breached an implied duty of good faith and fair dealing by refusing to provide discovery in this litigation that CACI believes would have been helpful in defending itself against plaintiffs' claims. Accordingly, sovereign immunity with respect to this claim is not waived by the nature of plaintiffs' allegations because no jus cogens issues are involved in this claim. Instead, CACI argues that the Little Tucker Act functions as a waiver of sovereign immunity for its contract claim. CACI MTD Opp'n 29 (citing 28 U.S.C. § 1346(a)(2) ). That Act provides district courts with jurisdiction (concurrent with the United States Court of Federal Claims) over any "civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1346(a)(2), but it exempts "any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to" the Contracts Dispute Act ("CDA"), id. The CDA covers, among other contracts, "any express or implied contract ... made by an executive agency for ... the procurement of services." 41 U.S.C. § 7102(a). The CDA includes certain statutory review procedures, id. §§ 7103-7107, that are "exclusive of jurisdiction in any other forum." United States v. J & E Salvage Co., 55 F.3d 985, 986 (4th Cir. 1995). "Thus, federal district courts lack jurisdiction over government claims against contractors which are subject to the CDA." Id.
CACI argues that its claim is "not necessarily rendered contractual in nature for CDA purposes simply because" its relationship with the United States is "contractual in nature" and that the "essence" of its claim is not a contractual claim that would be subject to the provisions of the CDA, but rather a claim for "recovery of any tort judgment against it." CACI MTD Opp'n 27-29. CACI's argument fails. The Little Tucker Act and the CDA read together put CACI in a double bind. On one hand, if CACI's claim is "founded upon" its contract for services with the federal government, then it is subject to the exclusion in the Little Tucker Act because the underlying *969 contract is "subject to" the CDA. On the other hand, if CACI's claim is not "founded upon" its contract with the federal government, then it never falls within the Little Tucker Act in the first place because § 1346(a)(2) only reaches claims "founded ... upon any express or implied contract with the United States." Either way, the Little Tucker Act does not provide for jurisdiction.[15]
Although the CDA does not define the type of "claims" it governs, the Federal Acquisition Regulations ("FARs") define a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract," 48 C.F.R. § 2.101(b), and courts have generally adopted this definition for purposes of the CDA, see Todd Constr., L.P. v. United States, 656 F.3d 1306, 1311 (Fed. Cir. 2011). This definition, which reaches assertions for any "relief arising under or relating to the contract," is extremely broad, and CACI's claim, which seeks damages for a breach of the implied duty of good faith and fair dealing contained in its contract with the government, easily qualifies as such a claim.
CACI cites a variety of cases in which courts looked at factors such as the type of relief sought by the plaintiff, the basis for the plaintiff's claims, and whether the Court of Federal Claims had any special expertise in the matter to determine whether the plaintiff's claims were "in essence" contract claims subject to the CDA; however, none of the cases cited by CACI involved a breach of contract cause of action. Instead, these cases involved situations where a plaintiff that had a contractual relationship with the federal government attempted to plead around the CDA by recasting its claims as sounding in tort or other areas of law. Accordingly, the courts undertook an examination of the claims to ensure compliance with the principle that "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." Ingersoll-Rand Co. v. United States, 780 F.2d 74, 77 (D.C. Cir. 1985). In this case, CACI has explicitly pleaded Count 4 as a breach of contract claim, which means that there is no need for the Court to engage in this analysis of the essence of the claims: the claim arises from and is related to CACI's contract for services with the federal government because the foundation of the claim is a breach of that contract.
Moreover, even if the Court were to consider these other factors, the result would be the same. CACI seeks up to $ 10,000 in reimbursement for any future tort judgment against it as breach of contract damages and cites no law establishing any duty it contends the government has breached or otherwise establishing the government's liability to CACI. In addition, although CACI's breach of contract claim does not call for a price adjustment or other FAR-dependent analysis that *970 might involve the core competency of the Court of Federal Claims, there is a governmental interest in having a uniform national rule about whether government contracts include an implied duty regulating the government's handling of discovery requests in litigation related to the contractor's activity. This governmental interest is best advanced by the procedures of the CDA and subsequent review by the Court of Federal Claims, not district courts.
Accordingly, CACI's breach of contract claim is undeniably subject to the provisions of the CDA, which means that this Court does not have jurisdiction over it. Accordingly, the United States' Motion to Dismiss will be granted as to Count 4.
III. CACI'S MOTION TO DISMISS
Piggybacking on the United States' motion to dismiss based on sovereign immunity, CACI has moved to dismiss plaintiffs' Third Amended Complaint based on a claim of "derivative sovereign immunity." Dkt. No. 1149. CACI argues that if sovereign immunity protects the United States from its third-party claims, then it should be protected from plaintiffs' claims because the conduct at issue occurred when it was a government contractor.
Derivative sovereign immunity shields a government contractor from suit when (1) the United States would be immune from suit if the claims had been brought against it, (2) the contractor performed services for the sovereign under a validly awarded contract, and (3) the contractor adhered to the terms of the contract. See Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 646-47 (4th Cir.) (citing Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 20-21, 60 S.Ct. 413, 84 L.Ed. 554 (1940) ), cert. denied, --- U.S. ----, 139 S.Ct. 417, 202 L.Ed.2d 315 (2018). Because this Court has ruled that sovereign immunity does not protect the United States from claims for violations of jus cogens norms, the first prong of the derivative sovereign immunity test is not met, and CACI's Motion to Dismiss based on a theory of derivative immunity will be denied.[16]
Even if the Court had concluded that sovereign immunity protected the United States from suit, it is not at all clear that CACI would be extended the same immunity. As plaintiffs argue in their Opposition [Dkt. No. 1172], the Supreme Court has held that derivative immunity is not guaranteed to government contractors and is not awarded to government contractors who violate the law or the contract. Campbell-Ewald Co. v. Gomez, --- U.S. ----, 136 S.Ct. 663, 672-74, 193 L.Ed.2d 571 (2016). The task orders under which CACI provided interrogators to the United States Army required that CACI employees conduct themselves "[in accordance with] Department of Defense, U.S. Code, and International Regulations." CACI Decl. [Dkt. No. 1154] Ex. 3. To the extent that plaintiffs have alleged that CACI conspired with and aided and abetted military personnel in committing acts of torture, CIDT, and war crimes, CACI would not have acted in accordance with the U.S. Code and international regulations. When a contractor breaches the terms of its contract with the government or violates the law, sovereign immunity will not protect it.
Yearsley, the Supreme Court case from which this doctrine of limited derivative immunity originates, "suggests that the contractor must adhere to the government's *971 instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.' " See In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 345 (4th Cir. 2014) (alteration in original) (quoting Yearsley, 309 U.S. at 22, 60 S.Ct. 413 ); see also Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963) (stating that a government contractor is not liable under Yearsley if the work was done under the contract and in conformity with the contract terms but may be liable for damages from acts "over and beyond acts required to be performed by it under the contract" or "acts not in conformity with the terms of the contract"). Regardless, CACI's Motion to Dismiss fails because the United States does not enjoy sovereign immunity for these kinds of claims.
IV. UNITED STATES' MOTION FOR SUMMARY JUDGMENT
In its Motion for Summary Judgment, the United States primarily argues that all claims between CACI and the federal government "arising out of or related to" the two task orders under which CACI placed civilian interrogators at Abu Ghraib were settled in 2007.
The following facts are not disputed. CACI provided interrogators to the United States Army pursuant to Task Orders 35 and 71. U.S.' Mem. of Law in Supp. of its Mot. for Summ. J. [Dkt. No. 1130] ("Gov't SJ Mem.") ¶ 1. These task orders were issued and administered by the United States Department of the Interior ("DOI"). Id. ¶ 2. Some of the interrogators provided by CACI pursuant to these task orders were sent to Abu Ghraib. Id. ¶ 5. In June 2004, several individuals who alleged they were subjected to torture while detained at Abu Ghraib filed a putative class action complaint against CACI's parent company. Id. ¶ 8.[17] In December 2006, while that class action was proceeding in the United States District Court for the District of Columbia, CACI noticed an appeal in a dispute over several task orders, including Task Orders 35 and 71. Id. ¶ 10. This appeal was docketed as CBCA No. 546 in the Civilian Board of Contract Appeals ("CBCA"). Id. (citing Exs. 2, 7). In February 2007, CACI agreed to a "full and final settlement of all claims and disputes arising out of" the terminated task orders in exchange for the government's payment of $ 200,000, which CACI agreed "shall constitute full and final payment, settlement, and accord and satisfaction of all claims and disputes by DOI and CACI arising out of or related to the terminated Task Orders, including those in CBCA No. 546, including but not limited to all claims for interest, general administrative costs, direct and indirect costs of all kinds whatsoever relating to the terminated Task Orders." Id. ¶¶ 11-12 (emphasis added) (citing Ex. 2).
A. Standard of Review
Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of *972 evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.
B. Settlement Agreement
The United States argues that all of CACI's third-party claims "aris[e] out of" and are "related to" Task Orders 35 and 71, Gov't SJ Mem. Ex. 2 ¶ 3, and because CACI and the United States settled all claims and disputes arising out of or related to these task orders, the United States is entitled to judgment as a matter of law. Settlement agreements with the federal government, such as the one at issue here, are governed by federal common law, see Moore v. U.S. Dep't of State, 351 F.Supp.3d 76, 88 (D.D.C. 2019), of which the Court of Federal Claims and the Federal Circuit are "a rich source," Trout v. Comm'r, 131 T.C. 239, 251 (2008). Where the provisions of a settlement agreement are "clear and unambiguous, they must be given their plain meaning." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004). Broadly worded releases evince "an intent to make an ending of every matter arising under or by virtue of the contract." United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 128, 27 S.Ct. 676, 51 L.Ed. 983 (1907). The language employed in the 2007 settlement agreement is indeed broad and speaks for itself: the agreement constitutes "full and final" settlement of "all claims and disputes" "arising out of or related to" the task orders. Gov't SJ Mem. Ex. 2 ¶ 3. In addition to stressing the plain meaning of the words in the settlement agreement, the United States further supports its argument by pointing to CACI's description of plaintiffs' claims as "arising out of CACI PT's performance of its contract," Compl. ¶ 57.
CACI responds to this argument by citing Fourth Circuit case law holding that the phrase "arising out of or related to" reaches only "dispute[s] between the parties having a significant relationship to the contract." See Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 769 (4th Cir. 2006) (citation omitted). This line of Fourth Circuit case law does not help CACI because it is limited to interpreting the scope of arbitration agreements. See U.S.' Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. [Dkt. No. 1168] 4-5 ("It is no coincidence that CACI refers the Court only to arbitration agreement cases that apply Fourth Circuit precedent. The Fourth Circuit has an unusual line of arbitration cases in which the court injected a significant-relationship test into arbitration agreements that use the 'arising out of or relating to' formulation." (emphasis omitted) ). Furthermore, in Wachovia Bank, the Fourth Circuit's most recent case on this issue, the panel acknowledged that it was "constrained to adhere to [its] precedent" but observed that the significant relationship test "appears to be at odds" with the language of the arbitration clause itself and may "be in tension with the Supreme Court's mandate that [courts] apply the ordinary tools of contract interpretation *973 in construing an arbitration agreement." 445 F.3d at 767 n.5.
Even if a significant relationship were required, one clearly exists in this case. The phrase "significant relationship" itself is to be interpreted broadly. See Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93-94 (4th Cir. 1996) (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement.") ). For example, an agreement to arbitrate "any dispute that arose out of or related to" a consulting agreement "did not limit arbitration to the literal interpretation or performance of the contract, but embraced every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Id. (alterations, emphasis, internal quotation marks, and citation omitted). As the United States argues, but for the task orders, CACI would not have provided interrogation services at Abu Ghraib. The task orders did not simply place CACI on the scene; they placed CACI personnel alongside United States military personnel with the job of interrogating detainees, and it was from that relationship that plaintiffs' allegations of abuse arose.
To avoid having its claims for indemnification, exoneration, and contribution barred by the settlement agreement, CACI argues that allegations of jus cogens violations exceed the bounds of that settlement agreement, citing the familiar adage that one cannot contract for unlawful acts. It argues that its claims are equitable in nature and "assertable without an allegation of contractual relationship," see Williams v. United States, 469 F.Supp.2d 339, 342 (E.D. Va. 2007) (citation omitted); however, "a claim may arise outside of an agreement and yet still be related to that agreement," Am. Recovery Corp., 96 F.3d at 95. As the United States appropriately argues, CACI's equitable claims still relate to the task orders and are therefore encompassed by the settlement agreement.
CACI had been on clear notice for several years that it was exposed to lawsuits directed at its conduct at Abu Ghraib when it entered into the settlement agreement in 2007. As discussed above, as early as 2004, several Abu Ghraib detainees had filed a putative class action complaint against CACI's parent company and two of its subsidiaries, alleging torture. If CACI wished to preserve its right to assert an equitable claim based on jus cogens violations, it should have, and could have, done so in the settlement agreement. See Dairyland Power Coop. v. United States, 27 Fed.Cl. 805, 811 (1993) ("If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it."). CACI did not do so, and the Court will not read such a reservation into the settlement agreement.
CACI points to the language in the settlement agreement that refers to the CBCA proceeding in an effort to limit the scope of the settlement to "those [claims and disputes] in CBCA No. 546, including but not limited to claims for interest, general administrative costs, direct and indirect costs of all kinds whatsoever relating to the terminated Task Orders." Gov't SJ Mem. Ex. 2 ¶ 3. This argument fails because it is the words "including but not limited to" that support the conclusion that the settlement agreement as a whole was "not limited" to just those claims.
In short, the unambiguous wording of the settlement agreement as concerning "all claims and disputes ... arising out of or related to the terminated Task Orders"
*974 bars CACI's claims against the United States, and for this reason the government is entitled to judgment as a matter of law. Therefore, its Motion for Summary Judgment will be granted.
V. CONCLUSION
For the reasons stated above, the United States' Motion to Dismiss will be granted as to Count 4 and denied in all other respects, CACI's Motion to Dismiss will be denied, the United States' Motion for Summary Judgment will be granted, and the Third-Party Complaint will be dismissed as to the United States by an appropriate Order to be issued with this Memorandum Opinion.

The First Circuit denied en banc review and upheld the decision that it did not have jurisdiction to hear a lawsuit for damages under the FTCA because the plaintiffs did not timely file an administrative notice of their claims. Id. at 524 (majority opinion). The plaintiffs, the estates and heirs of two men killed on the order of notorious Boston mobster Whitey Bulger, had sued the United States under the FTCA "for leaking confidential information to Bulger and enabling his reign of terror." Donahue v. United States, 634 F.3d 615, 616 (1st Cir. 2011).

Although the Vienna Convention has not been ratified by the United States, the "United States considers many of the provisions of the Vienna Convention on the Law of Treaties to constitute customary international law on the law of treaties." Vienna Convention on the Law of Treaties, U.S. Dep't of State, https://www.state.gov/s/l/treaty/faqs/70139.htm (last visited Mar. 11, 2019).

This does not compel the conclusion that federal sovereign immunity does not bar claims of violations of domestic law. The rights created by such laws, which are enacted by Congress against the backdrop of sovereign immunity, may be limited so as not to create a substantive right enforceable against the federal government. Cf. Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907) (explaining that sovereign immunity derives from the "ground that there can be no legal right as against the authority that makes the law on which the right depends"). With respect to violations of jus cogens norms, the substantive right has been created by international law and incorporated into federal common law. Accordingly, the right is not so limited and is enforceable against the federal government.

This structure for civil enforcement, including waiver of sovereign immunity in a state's own courts, also dovetails with Congress's original intent in passing the ATS. This statute was passed after "substantial foreign-relations problems" were caused by the "inability of the central government to ensure adequate remedies for foreign citizens" under the Articles of Confederation. Jesner v. Arab Bank, PLC, --- U.S. ----, 138 S.Ct. 1386, 1396, 200 L.Ed.2d 612 (2018). For example, "[i]n 1784, the French Minister lodged a protest with the Continental Congress after a French adventurer, the Chevalier de Longchamps, assaulted the Secretary of the French Legation in Philadelphia." Id. Similarly, "[a] few years later, a New York constable caused an international incident when he entered the house of the Dutch Ambassador and arrested one of his servants." Id. The Articles of Confederation did not provide a national forum to resolve these disputes, which caused tension with foreign governments and led to a fear that the failure to provide such a forum "might cause another nation to hold the United States responsible for an injury to a foreign citizen." Id. at 1397. In the case before this Court, the government has already disclaimed Iraqi jurisdiction over the American personnel who allegedly committed the jus cogens violations, despite their occurrence in Iraq against Iraqi citizens. Barring any civil suit in American federal court against the government officials involved or the government itself may result in Iraq or another government asserting jurisdiction with respect to the claims, thereby frustrating the original purpose of the ATS.

Indeed, the "very existence of jus cogens limits state sovereignty in the sense that the general will of the international community of states takes precedence over the individual wills of states to order their relation." Belsky et al., supra, at 390 (internal quotation marks and footnote omitted). Accordingly, "the concept that a sovereign is subject to no restraints except those imposed by its own will is inconsistent with the definition of jus cogens as peremptory law," id. at 390-91, and because the United States accepts the existence of jus cogens norms, it must also accept the conclusion that its immunity from suit is not categorical.

Cf. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 838-39, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring) ("The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.... A distinctive character of the National Government, the mark of its legitimacy, is that it owes its existence to the act of the whole people who created it.... As James Madison explained, the House of Representatives derives its powers from the people of America, and the operation of the government on the people in their individual capacities makes it 'a national government,' not merely a federal one." (quoting The Federalist No. 39 (James Madison), at 244, 245 (C. Rossiter ed. 1961) ) ).

The government also argues that three FTCA exceptions would apply to the breach of contract claim if it were reconceptualized as a tort, rather than a contract, claim, as CACI argues it should be: the exceptions for "[a]ny claim arising out of ... interference with contract rights," for "[a]ny claim arising out of ... misrepresentation," and for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government." Gov't MTD Mem. 23-25 (citing 28 U.S.C. § 2680(a), (h) ). CACI does not attempt to explain how its breach of contract claim, even if it were classified as a tort claim, would avoid any of these three exclusions.

Although CACI noticed its Motion for argument on April 5, 2019 [Dkt. No. 1173], no further discussion would change the outcome for the reasons stated above.

See Al Rawi v. Titan Corp., No. 3:04-cv-1143-R-NLS (S.D. Cal. June 9, 2003). This action was transferred to the United States District Court for the District of Columbia and amended in 2006 to name CACI as a defendant. Gov't SJ Mem. ¶ 8 (citing Saleh v. Titan Corp., No. 1:05-cv-01165-JR (D.D.C. Mar. 22, 2006) ).